2005 UT 15

**STATE of Utah, Plaintiff and Appellee,**

v.

**John R. PINDER, Defendant and Appellant.**

No. 20030484.

Supreme Court of Utah.

March 4, 2005.

Rehearing Denied June 1, 2005.

Mark L. Shurtleff, Att'y Gen., Karen A. Klucznik, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Brent A. Gold, Park City, Andrew Parnes, Ketchum, Idaho, for defendant.

DURRANT, Justice:

¶ 1 John R. Pinder was convicted on eleven felony counts in connection with the murders of June Flood and Rex Tanner. Pinder appeals those convictions and claims that a new trial is warranted because (1) the State failed to satisfy its constitutional obligation to disclose exculpatory evidence to the defense, (2) the trial judge made several erroneous evidentiary rulings, (3) a jury instruction failed to adequately inform the jury that the State had the burden to disprove beyond a reasonable doubt the affirmative defense of compulsion, and (4) new evidence uncovered after the conclusion of the trial is sufficiently compelling to make a different result on retrial probable. We conclude that a new trial is not warranted and therefore affirm the trial court's denial of Pinder's motion for a new trial.

## BACKGROUND

■ ¶ 2 "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Gordon,* 913 P.2d 350, 351 (Utah 1996). We do so notwithstanding Pinder's assertion that newly discovered evidence undermines confidence in the trial proceedings. *See State v. Loose,* 2000 UT 11, ¶¶ 1–2, 994 P.2d 1237 (reciting the facts in a light most favorable to the jury verdict even though the defendant asserted a newly discovered evidence claim on appeal).

## I. THE MURDERS OF JUNE FLOOD AND REX TANNER

¶ 3 Pinder owned a lion, which he kept in a pen on his Duchesne County ranch. Pinder kept a baseball bat, which he used to intimidate the beast, near the lion's pen. On a Sunday evening in late October 1998, Pinder used that bat to strike June Flood in the face, the first in a series of brutal and gruesome acts spanning several days, including a double murder and the implementation of a horrific scheme to destroy all evidence of the crime.

¶ 4 Pinder did not commit those acts alone. At trial, Filomeno Ruiz, an ostensible ranch hand, testified that he was present both when Pinder beat Flood and Rex Tanner with the baseball bat and when Pinder subsequently shot and killed the two victims.

¶ 5 Ruiz styled himself a member of the "Mexican Mafia" and was heavily involved in the drug trade. Pinder's primary purpose for keeping Ruiz at the ranch was to ensure a ready supply of drugs for his own use. At trial, Pinder conceded that Ruiz was a "drug smuggling, gun running, mafioso, wife beating, dog killer." Pinder additionally acknowledged that, while Ruiz did some work on the ranch—including feeding the ostriches and the ranch's resident lion—Ruiz was not supervised by Pinder's ranch hand supervisor. In fact, Pinder admitted that Ruiz did very little work at the ranch and agreed that Ruiz was no ordinary ranch hand, but was more akin to a personal employee. Pinder loaned his "personal employee" an AK-47[1] for "work on the ranch" and also provided him training in explosives. It was this personal employee who accompanied Pinder on the night he killed Flood and Tanner.

¶ 6 That night began benignly enough. Pinder and his live-in girlfriend, Barbara DeHart, along with Ruiz and Joe Wallen, Pinder's accountant, dropped in on another ranch employee, David Brunyer. The group gathered around Brunyer's campfire, talking and drinking beer. As the evening wound down, Pinder addressed Ruiz, saying, "let's go get some heads," a macabre reference to an earlier discussion in which Pinder had expressed that he had always wanted to own a shrunken head. Pinder, DeHart, Ruiz, and Wallen then departed and returned to the ranch. A short time later, Pinder informed DeHart that he and Ruiz were going to take a drive and have a "chat." Before the pair left the ranch, Pinder grabbed the baseball bat used for intimidating his lion and placed it in the truck. Pinder and Ruiz then drove

---

1. An AK–47 is "a Soviet-designed 7.62 mm (.30 cal.) gas-operated magazine-fed rifle for automat-ic or semi-automatic fire." *Merriam–Webster's Collegiate Dictionary* 28 (11th ed.2003).

to Flood's house, where they found both Flood and Tanner.

¶ 7 Pinder had sporadically employed Flood and Tanner. However, Tanner had ceased working for Pinder after injuring his leg in a horse accident, and Pinder had ordered Flood off the ranch after accusing her of playing a role in the theft of several documents that would have aided his estranged wife in a then-ongoing divorce dispute, which threatened the loss of the ranch. Pinder, "livid with anger," had later reported the theft to authorities. Pinder frequently spoke of his animosity toward Flood and Tanner and had even personally confronted and threatened the couple in connection with various disputes. At trial, the jury determined that Pinder put those threats into action on the evening he arrived at Flood's door, with Ruiz in tow and a baseball bat in hand.

¶ 8 After entering Flood's home, Pinder insisted that they all "go somewhere to talk." Flood and Tanner refused to leave and the confrontation quickly turned violent. Using his baseball bat, Pinder first hit Flood in the face and then struck Tanner in the leg. Pinder grabbed a rifle owned by Flood and pointed the weapon at his victims. Ruiz testified that Pinder looked as though "he had the devil" when wielding the weapon. Pinder, accompanied by Ruiz, then led the two injured victims, Flood holding her mouth and Tanner hobbling, to his pickup truck and drove to a nearby lake located on the ranch.

¶ 9 Pinder parked the truck by the lake, and all four occupants exited the vehicle. As the group walked toward the back of the truck, Pinder shot Flood twice, presumably with a pistol that had been located in the truck. Pinder then shot Tanner multiple times. The murders complete, Pinder began dragging the bodies to the cover of some nearby bushes. When he implored Ruiz to help move the bodies, Ruiz, previously frozen in fear, complied. After covering the bodies with the bushes, Pinder and Ruiz briefly returned to the ranch house before commencing a gruesome course of action intended to destroy all evidence of the murders.

## II.  THE AFTERMATH

¶ 10 At the time of the murders, Pinder owned a significant quantity of explosives, which he stored in caves relatively close to the ranch house. After their brief stop at the ranch house, Pinder and Ruiz drove to the caves and retrieved multiple bags of ammonium nitrate and several pieces of dynamite. Upon loading the explosives into the truck, Pinder and Ruiz returned to the site of the murders and began preparations to destroy the bodies of Flood and Tanner, as well as the rifle Pinder had taken from Flood's home.

¶ 11 Pinder piled the explosives on and around the victims, and placed the stolen rifle on top of the bodies. He then set off the explosion and returned to the ranch house with Ruiz. Once at the ranch house, Pinder cleaned his gun and burned the clothes he and Ruiz had been wearing that evening.

¶ 12 The following day, Pinder returned to the blast site and bulldozed the area until his bulldozer ran out of fuel. Later that night, Pinder, Ruiz, and DeHart went to Brunyer's residence for dinner. On their way to dinner, the group picked up several black bags, which they transported to the ranch dump and burned. Pinder informed Ruiz that the bags contained one of Tanner's legs and a shoe. After dinner, Pinder and Ruiz continued their efforts to rid the ranch of evidence, collecting additional body parts in black bags, which they then placed in a barrel located away from the site of the initial detonation. They destroyed the barrel using explosives.

¶ 13 The following morning, Brunyer became involved in the effort to cover up the double murder. Brunyer arrived at the ranch in order to do some welding, but Pinder requested that he first retrieve a fuel truck from Tanner's trailer in order to refuel the bulldozer Pinder had used in his efforts to bury evidence and disguise the blast site. Brunyer left with Wallen to comply with the request, but was stopped by Ruiz as he and Wallen were returning to the ranch house with the fuel truck. Ruiz spoke briefly with Wallen, who was driving the fuel truck, before Wallen continued driving to the ranch. After Wallen's departure, Ruiz approached

Brunyer. Ruiz handed Brunyer some paper towels and a bottle of rubbing alcohol and told him that Pinder needed him to wipe down Flood's home to remove any fingerprints. Per Pinder's instructions, Brunyer and Ruiz first went to the ranch house to drop off Pinder's truck, which Ruiz had been driving, and then returned to Flood's home in Brunyer's truck.

¶14 After attempting to clean Flood's home of fingerprints, Brunyer and Ruiz drove to the site of the murders and helped Pinder refuel the bulldozer, further disguise the blast site, and remove evidence. While at the blast site, Brunyer discovered a relatively large portion of Tanner's torso, to which Tanner's head remained attached. However, Brunyer did not draw attention to his discovery, disturb the remains, or tell Ruiz or Pinder about it. After learning of the murders and aiding in the cover-up, Brunyer feared for his life and spent the subsequent three nights in his wood stack with his rifle.

¶15 Soon after these events, a friend of Flood expressed her concern that Flood was missing, and a police investigation was initiated. Thereafter, while pursuing the investigation, Sergeant Wallace Hendricks entered Flood's home. He found the residence in disarray. The refrigerator was pulled away from the wall, pots and pans were on the floor, and blood stained the backrest of a living room chair and the sheets of a fold-out bed.

¶16 After leaving Flood's home, Sergeant Hendricks noticed a group of people standing around a nearby trailer and stopped to determine if anyone had information about the whereabouts of Flood or Tanner. Brunyer was among the members of the group and asked Sergeant Hendricks for a business card.

¶17 A short time later, Sergeant Hendricks was informed that Brunyer had been phoning dispatch, expressing his desire to talk to the police. Sergeant Hendricks made arrangements to have Brunyer taken to the

sheriff's office. When Brunyer arrived, he presented Sergeant Hendricks with the bottle of rubbing alcohol used to clean Flood's home and a letter, prepared by Brunyer's daughter, reporting Brunyer's version of the events he had witnessed. Sergeant Hendricks described Brunyer as "[v]ery agitated, very nervous, scared to death."

¶18 After speaking with Brunyer, Sergeant Hendricks organized a search of the site of the murders. The investigation culminated in the arrests of Ruiz and Pinder. Ruiz pleaded guilty to two counts of murder and disclosed information about the second blast site where evidence was destroyed.

¶19 Pinder was ultimately charged and convicted on eleven felony counts.[2] After his conviction, Pinder moved for a new trial, which the trial court denied. Pinder now appeals that ruling. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(i) (2002).

## STANDARD OF REVIEW

¶20 "When reviewing a trial court's denial of a motion for a new trial, we will not reverse absent a clear abuse of discretion by the trial court." *State v. Colwell*, 2000 UT 8, ¶12, 994 P.2d 177 (internal quotation omitted). "At the same time, however, we review the legal standards applied by the trial court in denying such a motion for correctness." *State v. Bisner*, 2001 UT 99, ¶31, 37 P.3d 1073. We review the trial court's factual findings for clear error. Utah R. Civ. P. 52(a); *State v. Burk*, 839 P.2d 880, 885 (Utah Ct.App.1992).

## ANALYSIS

¶21 On appeal, Pinder raises numerous allegations, which, he argues, require the grant of a new trial. Specifically, Pinder claims that (1) the State violated its constitutional duty to disclose exculpatory evidence to the defense, (2) the trial judge made evidentiary errors at trial, (3) the jury was improperly instructed on the affirmative de-

---

**2.** Pinder was charged and convicted on two counts of aggravated murder, two counts of aggravated kidnapping, one count of aggravated burglary, two counts of tampering with evidence, one count of burglary of a dwelling, one count of possession of an explosive device, and two counts of desecration of a dead body.

fense of compulsion, and (4) newly discovered evidence makes a different result on retrial probable. We address each of these arguments in turn.

## I. THE STATE COMPLIED WITH ITS DUTY TO DISCLOSE EXCULPATORY EVIDENCE

¶ 22 Pinder claims that the State violated its duty, as set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, to disclose exculpatory information that would have aided in his defense. We disagree.

■ ¶ 23 In *Brady,* the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The Supreme Court later expanded this principle by placing a duty on the prosecution to disclose material evidence favorable to a defendant even in the absence of a request by the accused. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The duty to disclose applies to substantive as well as impeachment evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

¶ 24 When claiming that the prosecution's failure to disclose evidence requires a new trial, the Supreme Court has stated that a defendant must show the following: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Consistent with this standard, we have declared that a *Brady* violation "occurs only where the state suppresses information that (1) remains unknown to the defense both before and throughout trial and (2) is material and exculpatory, meaning its disclosure would have created a 'reasonable probability' that 'the result of the proceeding would have been different.'" *State v. Bisner,* 2001 UT

99, ¶ 33, 37 P.3d 1073 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375).

¶ 25 Explaining the *Brady* inquiry announced in *Bisner,* we noted that "courts universally refuse to overturn convictions where the evidence at issue is known to the defense prior to or during trial, where the defendant reasonably should have known of the evidence, or where the defense had the opportunity to use the evidence to its advantage during trial but failed to do so." *Id.; see also United States v. Aichele,* 941 F.2d 761, 764 (9th Cir.1991) ("When ... a defendant has enough information to be able to ascertain the supposed [*Brady* ] material on his own, there is no suppression by the government."); *United States v. Pandozzi,* 878 F.2d 1526, 1529 (1st Cir.1989) (concluding that *Brady* is not violated when the defense could have obtained the information "with any reasonable diligence" (internal quotation omitted)); *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.1986) (the *Brady* "rule does not apply if the evidence in question is available to the defendant from other sources").

■ ¶ 26 Further, as the second component of the *Bisner* test makes clear, the evidence in question must be material, such that a different result on retrial is reasonably probable. 2001 UT 99 at ¶ 33, 37 P.3d 1073. It is important to note, however, that the *Brady* materiality standard is not identical to a sufficiency of evidence review. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (explaining that the *Brady* materiality analysis "is not a sufficiency of evidence test"). Rather, a reviewing court must look at the suppressed evidence and determine whether, taken cumulatively, the absence of the suppressed evidence at trial undermines confidence in the fairness of the proceeding. *See id.* at 434–35, 115 S.Ct. 1555. As a result, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555.

¶ 27 Pinder claims that the State violated its *Brady* obligation by failing to disclose information relating to three separate topics: (1) Ruiz's connection to the kidnapping and murder of one of his former rivals in the drug trade, Todd Skidmore; (2) allegations of police corruption in the Uintah Basin; and (3) Ruiz's plea negotiations with the State. We address each topic below.

## A. The Kidnapping and Murder of Todd Skidmore

¶ 28 Pinder alleges that the State failed to disclose information contained in FBI reports about Ruiz's connection to the kidnapping and murder of Todd Skidmore and that this failure rises to the level of a *Brady* violation because it deprived the defense of valuable impeachment evidence. Pinder's allegation fails, however, to meet the first *Brady* requirement identified in *Bisner*. Specifically, we conclude that Pinder, prior to the end of his trial, knew or should have known of the information he now alleges was suppressed. *See Bisner*, 2001 UT 99 at ¶ 33, 37 P.3d 1073.

¶ 29 Prior to trial, the State provided Pinder's counsel with a summary of a police interview with Mike Sweat, a former drug dealer who had previously sold drugs on Ruiz's behalf. In the interview, Sweat made express reference to the Skidmore incident and implied that Ruiz may have been involved in "ordering" the murder. The summation concluded with the following paragraph:

> According to the Uintah County Sheriff[']s Office[,] Ruiz couldn't be linked to the murder of Skidmore. Ruiz did know and associated with the people responsible for the murder of Skidmore. And they also believe that he is involved with the Mexican Mafia. For further information on Ruiz's involvement and the investigation of Skidmore contact the Colorado Attorney General[']s Office.[3]

¶ 30 In addition to the Sweat interview, Pinder's trial counsel also had information provided by Gary Potter, a private investigator, concerning the Skidmore incident. Prior to the start of Pinder's trial, Pinder's current counsel, Brent Gold, hired Potter to investigate the Skidmore murder. While conducting his investigation, Potter specifically inquired into whether the Skidmore murder could be "pinned" on Ruiz. Potter provided Pinder's trial counsel with a report of his investigation before trial commenced. At trial, Pinder's counsel even made limited use of Ruiz's connection to the Skidmore incident, delving into Ruiz's role in helping secure the return from Mexico of one of the individuals charged in the Skidmore murder. As the trial court pointed out, if Pinder chose to highlight the Skidmore incident at trial, he ran the risk of giving credence to the State's theory that Pinder hired Ruiz as a thug. Therefore, Pinder had a tactical reason to minimize information about Skidmore's kidnapping and murder.

¶ 31 As shown above, the State disclosed information about Ruiz's connection to the Skidmore incident and even provided defense counsel a source to contact for further information. Moreover, during the evidentiary hearing on Pinder's motion for a new trial, Pinder stipulated that he ultimately obtained the Skidmore reports from Colorado authorities and that those reports were never in the possession of the prosecutorial team handling Pinder's case. The fact that Pinder was able to obtain the reports, presumably due to the information provided by the State, undermines Pinder's assertion that the information in question was unobtainable unless the prosecution team actually provided Pinder with the reports.

¶ 32 We conclude that all the information contained in the Skidmore reports, or the reports themselves, could have been discovered by Pinder through reasonable investigation. Pinder had the opportunity to fully investigate the Skidmore murder prior to trial and chose, perhaps for tactical reasons, not to pursue that line of defense. Consequently, we conclude that the State did not suppress *Brady* material relating to the kidnapping and murder of Skidmore.

¶ 33 Even if we were to conclude that Pinder could not have learned of the evidence

3. Skidmore was kidnapped in Utah but was murdered in Colorado.

in question absent an express disclosure by the State, we would still be hard pressed to find that the evidence was material, as that term is used in the *Brady* context. Ruiz's character was thoroughly vetted at trial. The jury, for example, heard testimony that Ruiz constantly carried a firearm and that Ruiz had told Sweat he would "kill the chickens and dogs and [Sweat's] children and ... wife" while Sweat watched if Sweat discussed Ruiz's drug dealing with law enforcement. Additionally, Ruiz admitted on cross-examination that he had sold and used drugs and that he had fired a pistol into a table while arguing with Pinder's stepson. In short, the jury was well aware of Ruiz's drug dealing and violent history. Given the breadth of the evidence exposing Ruiz's character, the absence of a more detailed examination of the Skidmore incident cannot fairly be said to have undermined confidence in the fairness of the proceedings against Pinder.

*B.   Police Corruption in the Uintah Basin*

¶ 34 Pinder next claims that the State was obligated to disclose information about an FBI investigation into allegations of police corruption in the Uintah Basin. At trial, the defense advanced the theory that Ruiz killed Flood and Tanner. Pinder testified that he was not present when the murders occurred and that he only helped destroy evidence due to his fear of Ruiz and his belief that he could not go to the authorities because he "didn't trust the Duchesne County Police." According to Pinder, if the State had disclosed evidence of an FBI investigation into allegations of police corruption, the defense would have been able to use that evidence to give credence to Pinder's testimony.

¶ 35 However, as with Pinder's first *Brady* claim, the defense was well aware of allegations of police corruption in the Uintah Basin and, in fact, investigated those allegations prior to trial. Pinder has identified no infor-

mation in the supposedly suppressed reports that he could not have discovered through his own investigation.

¶ 36 Additionally, as with the documents underlying Pinder's first *Brady* claim, Pinder stipulated that documentation of the FBI investigation was never in the possession of the prosecution team from the Utah Attorney General's Office or the Duchesne County Attorney's Office[4] and that he obtained the documents from another source. Because Pinder reasonably could have known about the information he now alleges was suppressed, his *Brady* claim fails.

¶ 37 Even if the evidence in question had been suppressed, its disclosure prior to the conclusion of Pinder's trial would have had minimal impact, if any, on the proceedings. The jury heard testimony regarding the allegations of police corruption from U.S. Customs Special Agent Thomas D'Leon, and it is unlikely that information gleaned from the FBI reports concerning specific allegations, especially when no charges were ever filed in relation to those allegations, would have impacted the jury in any significant manner. As the trial court concluded, evidence of the federal investigation "is tangential and of little relevance." Such evidence is not material for the purposes of *Brady*.

*C.   Ruiz's Plea Negotiations with the State*

¶ 38 Pinder's final *Brady* claim relates to plea negotiations between Ruiz and the State. Specifically, Pinder claims that the State failed to disclose that Ruiz refused the State's initial plea offer and only agreed to testify after the State agreed to provide a more favorable plea bargain.

¶ 39 In denying Pinder's motion for a new trial, the trial court specifically found that Pinder was aware of the prior plea offer to Ruiz. This finding was based on comments

---

4.   Pinder's counsel added a caveat to this stipulation as to Kenneth Wallentine, who was working in Uintah County at the time of the Pinder investigation and aided in a very limited fashion with the investigation of the murders of Flood and Tanner. At the evidentiary hearing on Pinder's new trial motion, Wallentine testified that he was aware of investigations into alleged police misconduct, but that no charges were filed because

there was no probable cause to believe illegal activity had occurred. We have no need to determine whether Wallentine's connection to the prosecution team was sufficient to impute his knowledge to the State for the purposes of *Brady* because we conclude that the evidence in question was discoverable by Pinder's defense team prior to trial and therefore not suppressed.

made by the State during a pretrial conference addressing the potential impact a plea agreement with Ruiz would have on Pinder's trial. The State specifically stated that "[w]e've made, actually over the course of the last couple months, two different offers. The one that's currently on the table we have represented to [Ruiz's] counsel to be our final offer."

¶ 40 On appeal, Pinder has made no effort to challenge the trial court's conclusion that he was aware of the State's prior plea offer, and we therefore assume that the trial court's conclusion is adequately supported by the record. *See State v. Widdison*, 2001 UT 60, ¶ 60, 28 P.3d 1278 (noting that a party who wishes to challenge a factual finding must first marshal the evidence in support of that finding and then show why the marshaled evidence is insufficient to support the finding). Regardless, such a challenge would be unavailing because, under the facts presented, we cannot conclude that the trial court's factual finding was clearly erroneous. Pinder's knowledge of the prior plea offer to Ruiz is fatal to his *Brady* claim. It cannot be said that the evidence in question was suppressed within the meaning of *Brady*.

¶ 41 Because we conclude that none of the evidence identified by Pinder was suppressed, there is no need to conduct an analysis into whether the absence of the evidence, taken cumulatively, is so significant as to undermine faith in the fairness of Pinder's prosecution.[5] Consequently, we next address his claims regarding alleged evidentiary errors at trial.

## II. ALLEGED EVIDENTIARY ERRORS AT TRIAL

¶ 42 Pinder claims that the trial court made several erroneous evidentiary

rulings at trial and that a new trial is warranted as a result. Specifically, Pinder claims that the trial court committed error by (1) allowing Barbara DeHart to be called as a witness and admitting the testimony of those individuals called to impeach her; and (2) allowing the State to offer, as a prior consistent statement of Brunyer, a letter composed by his daughter, as well as testimony relating to the letter's creation. We conclude that Pinder waived these evidentiary arguments because he did not properly preserve his objections below and has failed to argue plain error or demonstrate exceptional circumstances justifying appellate review. We address each argument in turn.

### A. The Testimony and Impeachment of Barbara DeHart

¶ 43 On the witness stand, Barbara De-Hart denied having told her daughter, Melissa Cowles ("Melissa"), that Pinder had confessed to murdering Flood and Tanner. DeHart similarly denied making statements to Melissa and other family members implicating Pinder in the murders and implicating herself in the efforts to destroy evidence of the crime. Her denials allowed the State to impeach her testimony by calling Melissa, Melissa's husband Damion Cowles ("Damion"), and Bernie Knapp to counter De-Hart's recantation of the pivotal conversations.

¶ 44 Pinder argues that the State should have been foreclosed from calling DeHart to testify because, according to Pinder, the State's only purpose in calling her was to allow the State to later impeach her testimony through the use of prior inconsistent statements. He contends that the State

---

5. Pinder additionally alleges that the State's open-file policy excused him from the obligation to undertake a thorough investigation to uncover the evidence he now alleges was suppressed. The United States Supreme Court has concluded that it is reasonable to rely on a prosecutor's representations as to the scope of an open-file's contents. *See Strickler v. Greene*, 527 U.S. 263, 284, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). However, in this case, the State made no representation that the file it provided contained all evidence wherever located. The State simply represented that the file contained everything

that the police had provided the prosecution and that Pinder had essentially been provided with everything in the State's possession.

As mentioned above, Pinder stipulated that the allegedly suppressed evidence relating to the Skidmore incident and the investigation of police corruption was never in the possession of the prosecution team. While documentation of a prior plea offer to Ruiz was apparently not provided to the defense, Pinder had actual knowledge of the offer. Therefore, there was no suppression. *See Bisner*, 2001 UT 99 at ¶ 33, 37 P.3d 1073.

should be foreclosed from making an otherwise unavailable witness available through a grant of immunity when the sole purpose for obtaining the witness's testimony is to later impeach it.[6] This argument was raised for the first time in Pinder's motion for a new trial, and the merits of the claim were not addressed by the trial court.

¶ 45 Generally speaking, a timely and specific objection must be made in order to preserve an issue for appeal. Utah R. Evid. 103(a); *State v. Whittle*, 780 P.2d 819, 820–21 (Utah 1989). "Under ordinary circumstances, we will not consider an issue brought for the first time on appeal unless the trial court committed plain error or exceptional circumstances exist." *State v. Nelson–Waggoner*, 2004 UT 29, ¶ 16, 94 P.3d 186. When a party seeks review of an unpreserved objection, we require that the party articulate an appropriate justification for appellate review. *See State v. Pledger*, 896 P.2d 1226, 1229 n. 5 (Utah 1995) ("Because Pledger does not argue that exceptional circumstances or plain error justifies a review of the issue, we decline to consider it on appeal." (internal quotation marks and citation omitted)). We have also required the party seeking appellate review in such a situation to articulate the justification for review in the party's opening brief. *See Coleman v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122 ("[B]ecause Mr. Coleman did not properly raise these three issues in the trial court and thereby preserve them for appellate review, and because he argued plain error or manifest injustice for the first time in his reply brief, we decline to review them.").

¶ 46 Although Pinder argued in his motion for a new trial that the State should have been foreclosed from calling DeHart for the sole purpose of impeaching her, that fact alone does not preserve his argument for appellate review. As we explained in *State v. Johnson*, 821 P.2d 1150, 1161 (Utah 1991), the purpose of the preservation

rule is to ensure that the trial court is first given an opportunity to decide if a mistake has been made before appellate review becomes appropriate. Although a new argument may be advanced when moving for a new trial, "the trial court may refuse to consider the merits of the argument ... because it may find the issue waived." *Id.* If the trial court refuses to address the merits of the newly advanced argument, the issue remains unpreserved for appellate review and may be addressed only if the challenging party can show plain error or exceptional circumstances. *See id.*

¶ 47 In this case, the trial court declined to address the merits of Pinder's claim that the State should have been foreclosed from calling DeHart for the sole purpose of impeaching her testimony. As a result, Pinder was obligated to argue on appeal that allowing DeHart to take the stand constituted plain error on the part of the trial judge or that exceptional circumstances make appellate review appropriate. Pinder has failed to do so. Therefore, his claim that the State called DeHart for an improper purpose is not preserved, and we decline to address it.

¶ 48 Pinder also contends that the admission of DeHart's testimony, and the testimony of those witnesses called to impeach her, was more prejudicial than probative and therefore violated rule 403 of the Utah Rules of Evidence. For the reasons outlined below, we conclude that Pinder has failed to preserve these arguments, and we therefore decline to address them.

¶ 49 Rule 24(a)(5) of the Utah Rules of Appellate Procedure requires appellants to provide either "citation to the record showing that the issue was preserved in the trial court" or "a statement of grounds for seeking review of an issue not preserved in the trial court." Utah R.App. P. 24(a)(5)(A)-(B). In an attempt to satisfy this requirement, Pinder provides a blanket statement that all

---

**6.** At trial and in his motion for a new trial, Pinder objected to Melissa's testimony about the alleged confession Pinder made to DeHart on hearsay grounds. Pinder has abandoned his hearsay argument on appeal, and we therefore decline to address it. Additionally, while Pinder argued at trial that Melissa's testimony violated

the Confrontation Clause of the United States Constitution, Pinder has abandoned that claim on appeal, stating that he does "not claim that the admission of the statements after DeHart testified at trial was an independent violation of the Confrontation Clause."

issues raised on appeal in relation to the admissibility of the testimony of DeHart, and the testimony of those witnesses called to impeach her, were preserved in the trial court. In support of this contention, he cites the State's motion in limine seeking the admission of Melissa's testimony and his own response to that motion.[7] The portions of the record upon which Pinder relies, however, do not show that any rule 403 objections to the testimony of either DeHart or the impeaching witnesses were properly preserved.

¶ 50 First, Pinder has not identified any point in the record where he made an adequately specific rule 403 objection to the admission of DeHart's testimony, and our review of the record has not uncovered such an objection. Therefore, we conclude that any rule 403 objection to DeHart's testimony was not preserved for appellate review. Because Pinder has failed to argue plain error or show exceptional circumstances on appeal, we decline to address his contention that DeHart's testimony violated rule 403. *See supra* ¶ 45; *Coleman,* 2000 UT 98 at ¶ 9, 17 P.3d 1122.

¶ 51 Second, Pinder has failed to establish that he made a specific rule 403 objection to Melissa's testimony. During trial, Pinder opposed the admission of Melissa's testimony exclusively on hearsay grounds. Although Pinder's arguments at trial question the reliability of Melissa's testimony, they do so in the context of the hearsay doctrine and do not constitute a specific rule 403 objection. Because Pinder has failed to argue in his opening brief that the alleged rule 403 violation caused by Melissa's testimony constituted plain error or that exceptional circumstances justify appellate review, we decline to address the argument on appeal. *See supra* ¶ 45; *Coleman,* 2000 UT 98 at ¶ 9, 17 P.3d 1122.

¶ 52 Third, and finally, Pinder has been unable to show that his rule 403 objections to the testimony of Damion and Knapp were preserved for appellate review. A review of the record shows that Pinder's objections to

the testimony of Damion and Knapp were limited in scope to cover only any attempt by those witnesses to testify concerning Pinder's confession to DeHart. Pinder's counsel argued that

> what is cumulative and what is prejudicial here is having [them] relate, again for the jury, the fact that "she told me John had killed two people." That's the essence of our argument from the get-go. And I agree with you as it relates to novel material or evidence [relating to whether evidence was destroyed while DeHart and Pinder traveled between Duchesne and Idaho]; the [S]tate is entitled to introduce that testimony.

The trial court agreed with Pinder's counsel and prohibited Damion and Knapp from testifying about Pinder's confession to DeHart.

¶ 53 In Pinder's motion for a new trial, his original objection to the testimony of Damion and Knapp was revived and expanded nearly beyond recognition. In stark contrast to his earlier position, Pinder argued that rule 403 barred all the testimony supplied by Damion and Knapp. The trial court, correctly recognizing that Pinder was attempting to advance a much more sweeping objection than that lodged at trial, declined to address the claim, stating that the issue had been waived. Because the trial court decided not to address the merits of Pinder's new theory, Pinder's argument that rule 403 barred all testimony from Damion and Knapp remained unpreserved. In his opening brief, Pinder failed to argue that the admission of the testimony of Damion and Knapp constituted plain error or that exceptional circumstances justify appellate review of the trial court's ruling on the matter. Due to this failure, we decline to address the issue. *See supra* ¶ 45; *Coleman,* 2000 UT 98 at ¶ 9, 17 P.3d 1122.

¶ 54 Having determined that Pinder's arguments with respect to DeHart's testimony were waived, we next turn to Pinder's allegation of error regarding the admission of testimony from Brunyer's daughter as well as the letter she prepared.

---

7. Pinder also cites his memorandum in support of his motion for a new trial. However, as discussed above, an argument raised for the first time in a motion for a new trial is not automatically preserved for appellate review. Rather, the argument is deemed preserved only if the trial court chooses to address the merits of the otherwise waived argument. *See supra* ¶ 46.

## B. The Prior Consistent Statement of David Brunyer

¶ 55 At trial, the State sought to introduce the testimony of Brunyer's daughter, along with a letter she had written before Brunyer began cooperating with the police. In that letter, she detailed how Brunyer became involved in the cleanup of evidence and what he witnessed during that process.[8]

¶ 56 The State sought to admit this evidence after the defense suggested during Brunyer's cross-examination that he had received favorable treatment from the State in exchange for his cooperation in Pinder's prosecution. The State argued that the defense's line of questioning made the testimony of Brunyer's daughter, and the letter she had composed, admissible as prior consistent statements because the evidence tended to establish that Brunyer's trial testimony was consistent with statements he made prior to the time he went to the police—i.e., statements given at a point before which Brunyer believed he could obtain leniency in exchange for his cooperation with the prosecution.[9] According to the State, allowing evidence of Brunyer's prior consistent statements would rehabilitate him in the eyes of the jury. The trial court found the State's argument persuasive and admitted the evidence.

¶ 57 On appeal, Pinder advances a new, overarching theory, one not presented during trial, that Brunyer and Ruiz committed the murders of Flood and Tanner. Under this new theory, Pinder argues that Brunyer's motivation to lie arose simultaneously with his participation in the murders. As a result, Pinder contends the letter prepared by Brunyer's daughter, as well as her testimony concerning the contents and creation of that letter, does not provide evidence of consistent statements that predate the time when Brunyer had a motive to lie. Accordingly, Pinder argues that the trial court erred by admitting the evidence.

¶ 58 Pinder's current argument was not presented during trial, and the trial court considered the argument waived when ruling on Pinder's motion for a new trial.[10] As a result, we conclude that the argument Pinder now advances was not properly preserved. Because Pinder has failed to argue that the admission of the evidence constituted plain error or that appellate review is otherwise justified by exceptional circumstances, we decline to consider the merits of his argument. *See supra* ¶ 45; *Coleman,* 2000 UT 98 at ¶ 9, 17 P.3d 1122.

¶ 59 Having concluded that Pinder's evidentiary arguments were waived, we now address his final allegation of error in relation to the underlying trial before addressing his newly discovered evidence claim.

## III. ALLEGED DEFECT IN JURY INSTRUCTION

¶ 60 At trial, Pinder raised the affirmative defense of compulsion in relation to

8. Brunyer's daughter prepared the letter with the aid of shorthand notes, which she had taken while Brunyer recounted his involvement with the cleanup. Brunyer's daughter used those notes to help her compose a more formal written statement of what Brunyer had witnessed. She subsequently destroyed the notes.

9. Rule 801(d)(1)(B) of the Utah Rules of Evidence provides that a statement is not hearsay if "[t]he declarant testifies at the trial ... and is subject to cross-examination concerning the statement and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Utah R. Evid. 801(d)(1)(B).

10. Interestingly, Pinder's new theory as to why the trial court erred in admitting the evidence provided by Brunyer's daughter is linked to his newly discovered evidence claim, discussed *infra* ¶ 64, that evidence discovered after trial implicates Brunyer in the commission of the murders. Without suspecting that Brunyer was involved in the murders, Pinder could not have made the evidentiary error argument he now advances on appeal. Technically, therefore, Pinder could not have "waived" the evidentiary argument he now advances because that argument is grounded in evidence that was allegedly not discoverable before or during trial.

However, the discovery of new evidence after the conclusion of a trial does not allow a party to *directly attack* an evidentiary ruling, made during trial, on new grounds. Rather, the possibility of a more favorable evidentiary ruling, had the newly discovered evidence been available at trial, should be included in the analysis of whether it is probable that a new trial with the presence of the newly discovered evidence would provide a defendant with a more favorable result.

the destruction of evidence charges. On appeal, Pinder claims that the jury instruction on that affirmative defense impermissibly reduced the State's burden of proof. Pinder's argument rests on the fact that, although the instruction did provide that the State carried the burden of disproving the affirmative defense, it did not expressly require that the State do so beyond a reasonable doubt.

¶ 61 Pinder acknowledges that he did not object to the jury instruction at trial, but nevertheless argues that we can address whether the jury instruction constituted a "manifest injustice." *See* Utah R.Crim. P. 19(e). While this is generally true, we have consistently declined to review allegations of jury instruction error, even under the manifest injustice standard, when the error complained of was invited.

¶ 62 A jury instruction may not be assigned as error, even if such instruction would otherwise constitute manifest injustice, "if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction." *State v. Hamilton,* 2003 UT 22, ¶ 54, 70 P.3d 111; *see also State v. Geukgeuzian,* 2004 UT 16, ¶ 9, 86 P.3d 742. "This prevents a party from taking advantage of an error committed at trial when that party led the trial court into committing the error." *Hamilton,* 2003 UT 22 at ¶ 54, 70 P.3d 111 (internal quotation marks omitted).

¶ 63 In this case, Pinder not only failed to object to the affirmative defense jury instruction at trial, but also stipulated to that instruction, signaling by an affirmative act that he had no objection. Because Pinder invited any error of which he now complains, we decline to reach the merits of his claim. *See id.*

## IV. NEWLY DISCOVERED EVIDENCE

¶ 64 Pinder's final argument on appeal is that evidence uncovered after the conclusion of his trial establishes that Brunyer and Ruiz murdered Flood and Tanner and that a new trial is warranted as a result. Specifically, Pinder claims that Brunyer has now confessed to his involvement in the homicides. Additionally, Pinder has uncovered a witness willing to testify that Ruiz stated that Brunyer, not Pinder, was present at the time of the murders. Pinder has also identified several other witnesses who he claims are either newly discovered or will testify concerning new information.

¶ 65 After reviewing the newly discovered evidence at an evidentiary hearing, the trial court denied Pinder's motion for a new trial, concluding that some of the evidence provided could not properly be designated as "newly discovered" and that the remaining evidence was of such suspect credibility as to make a different result on retrial unlikely. We agree.

### A. Standards Governing Newly Discovered Evidence Claims

¶ 66 As we recently stated in *State v. Montoya,* newly discovered

[e]vidence must meet three criteria in order to constitute grounds for a new trial: (1) it must be such as could not with reasonable diligence have been discovered and produced at the trial; (2) it must not be merely cumulative; [and] (3) it must be such as to render a different result probable on the retrial of the case.

2004 UT 5, ¶ 11, 84 P.3d 1183 (second alteration in original) (internal quotation omitted). Generally, "newly discovered evidence does not warrant a new trial where its only use is impeachment." *State v. Boyd,* 2001 UT 30, ¶ 28, 25 P.3d 985.[11] "We afford trial judges

---

11. The State would have us adopt the newly discovered evidence test recently utilized in situations involving petitions for post-conviction relief. *See Wickham v. Galetka,* 2002 UT 72, ¶¶ 9, 13, 61 P.3d 978; *Julian v. State,* 2002 UT 61, ¶¶ 15, 20, 52 P.3d 1168. In *Wickham* and *Julian,* we applied the language of the Post–Conviction Remedies Act, which states that newly discovered evidence does not warrant post-conviction relief if the new evidence is "merely impeachment evidence." Utah Code Ann. § 78–35a–

104(e)(iii) (2002). Despite potentially misleading dicta to the contrary, we have never held that "mere" impeachment evidence is insufficient in all situations to justify the granting of a new trial in the course of regular appellate review.

The different standards have been applied in the past because we have recognized a heightened burden on petitioners in the post-conviction relief context. *See Julian,* 2002 UT 61 at ¶ 16, 52 P.3d 1168 (" '[E]vidence of [the defendant's]

'a wide range of discretion' in determining whether newly discovered evidence warrants the grant of a new trial." *Montoya,* 2004 UT 5 at ¶ 10, 84 P.3d 1183 (quoting *State v. James,* 819 P.2d 781, 793 (Utah 1991)). This deference is due, in part, to the superior position the trial judge holds when assessing the credibility of the new evidence, an essential component of the determination of whether the evidence would make a different result on retrial probable. *See State v. Loose,* 2000 UT 11, ¶ 18, 994 P.2d 1237. "[I]t is appropriate in the context of a new trial motion based on newly discovered evidence to give the trial court the power to consider the testimony's probable weight as part of its determination as to whether that testimony would make a different result probable *on* retrial." *Id.* (internal quotation marks omitted). "[P]art of that weight certainly is the likelihood that a jury would find it credible." *Id.*

■■■■ ¶ 67 As a result, it is proper for the trial court, when confronted with a motion for a new trial due to newly discovered evidence, to consider the credibility of new witnesses as well as the manner in which new evidence meshes or clashes with evidence presented at trial. *See id.* If, after weighing these factors, the trial court determines that a different result on retrial is not probable, the motion must be denied. We will reverse a trial court's denial of a motion for a new trial only if the trial court abused its discretion. *State v. Colwell,* 2000 UT 8, ¶ 12, 994 P.2d 177.

innocence must be stronger than would be necessary in the first instance in support of a motion for a new trial, for special writs are applied for after the defendant's conviction has been affirmed or denied on appeal, and in a sense they invade the usual rules for the finality of judgments.' ") (quoting *Ward v. Turner,* 12 Utah 2d 310, 366 P.2d 72, 74 (1961)). Therefore, we reaffirm that newly discovered impeachment evidence can justify the granting of a new trial in certain situations. *See Montoya,* 2004 UT 5 at ¶ 11, 84 P.3d 1183. Because it is not before us, we decline to address the issue of whether the Post–Conviction Remedies Act's disallowance of post-conviction relief on the basis of newly discovered impeachment evidence is consistent with our case law predating that act and what effect, if any, such an inconsistency may have. *See*

## B. Pinder's New Evidence Is Insufficient to Justify a New Trial

■■■■ ¶ 68 Having laid out the relevant law, we now apply the standard articulated above to the newly discovered evidence proffered at the evidentiary hearing. Pinder's new witnesses can be loosely categorized in accordance with the substance of their testimony.[12] Therefore, we will address in turn the testimony of (1) James Hill ("James") and Leann Hill ("Leann"), (2) Christina Moellmer and Gene Kelley, (3) Robert Brunyer ("Robert") and Kristy Barnes, and (4) Joey Silva.

### 1. James and Leann Hill

¶ 69 In support of his claim that newly discovered evidence warrants the grant of a new trial, Pinder first offers the testimony of James and Leann Hill, David Brunyer's brother-in-law and sister.

¶ 70 The substance of James's testimony at the evidentiary hearing concerned only reservations about David Brunyer's character, and events that occurred prior to Pinder's trial, all of which James had related to the defense team prior to the commencement of trial. Not only was this evidence discoverable with reasonable diligence prior to the conclusion of trial, it actually was discovered, and the defense team simply chose not to make use of it. As a result, James's evidence cannot properly be defined as "newly discovered" evidence.

¶ 71 Similarly, the bulk of Leann's evidentiary hearing testimony contained no new information.[13] Leann testified that David

*Gardner v. Galetka,* 2004 UT 42, ¶ 17, 94 P.3d 263.

**12.** Pinder argues that the evidence underlying his *Brady* claim must be considered as part of the newly discovered evidence warranting a new trial. However, because we conclude that the State did not improperly suppress evidence and that Pinder either knew or should have known of the evidence underlying his *Brady* claim, that evidence is not properly classified as "newly discovered" and will not be considered when determining whether a new trial is warranted due to newly discovered evidence.

**13.** Although Leann did testify that her brother, Robert Brunyer, allegedly had knowledge of a confession to the murders made by David Bru-

Brunyer used drugs, was very manipulative, and had stored explosives at their mother's house.

¶ 72 Because the information provided by James and Leann was available or known to Pinder before the conclusion of his trial, that evidence cannot be classified as "newly discovered" and therefore cannot justify the grant of a new trial.

### 2. Christina Moellmer and Gene Kelley

¶ 73 The evidence provided by Christina Moellmer and Gene Kelley suffers from the same defect as the evidence provided by James and Leann Hill. Specifically, the defense has failed to show that the information was not obtainable prior to the conclusion of Pinder's trial.

¶ 74 Moellmer is David Brunyer's sister. She offered testimony that he possessed explosives paraphernalia and at one time threatened to blow up the house of Stephen Brunyer, their brother. Although Moellmer had no contact with Pinder's defense team prior to trial, we conclude that a reasonably diligent search would have uncovered the information she possessed.

¶ 75 Kelley, unlike the majority of the witnesses that form the basis for Pinder's newly discovered evidence claim, is not a relative of David Brunyer. Rather, it appears that Kelley and David Brunyer were acquaintances. According to Kelley's stipulated testimony, in 1996, David Brunyer asked Kelley to kill some men who had cheated him in a drug deal. Kelley also alleges that David Brunyer once fired a rifle pointing dangerously close to Kelley's head. Pinder has made no effort to explain why the information from Kelley could not have been obtained through a reasonably diligent search and produced at trial. As a result, the evidence offered by Kelley, like that offered by Moellmer, is not "newly discovered" evidence.

¶ 76 Even if Pinder had met his burden of illustrating that the evidence provided by Moellmer and Kelley could not have been discovered before the conclusion of trial, we would still be disinclined to consider the evidence of any substantial importance. The trial court concluded that Kelley's credibility was suspect and that the evidence both Kelley and Moellmer provided amounted to nothing more than cumulative impeachment evidence, which would likely be inadmissible[14] at a new trial if Pinder proceeded on the theory that David Brunyer was involved in the murders. We are inclined to agree with the trial court's conclusion, but because Pinder has failed to establish that the evidence supplied by Moellmer and Kelley was not discoverable before the conclusion of Pinder's trial, we hold that the evidence was not "newly discovered" and therefore cannot serve as grounds for a new trial.

### 3. Robert Brunyer and Kristy Barnes

¶ 77 The next witnesses Pinder identifies in support of his newly discovered evidence claim are Robert Brunyer and Kristy Barnes. Robert is David Brunyer's brother and Barnes is Robert's girlfriend. According to Pinder, both of these witnesses heard David Brunyer confess, after the conclusion of Pinder's trial, that he participated in the actual murders of Flood and Tanner. In the proceedings below, the trial court concluded that the testimony offered by Robert and Barnes was not discoverable before the conclusion of Pinder's trial and that the evidence was not cumulative. The State has not challenged those conclusions.

¶ 78 Despite considering the testimony "newly discovered" and not cumulative, the trial court ruled that the testimony did not justify the grant of a new trial. The trial court considered the credibility of the two witnesses to be highly suspect and not enti-

---

nyer after the conclusion of Pinder's trial, that information is closely linked to Robert's credibility, which is discussed *infra* ¶¶ 79–81.

**14.** Moellmer's testimony concerning David Brunyer's possession of explosives paraphernalia would be cumulative of the trial testimony of Scott Johnson, who testified that Brunyer was knowledgeable of explosives and used them ex-

tensively. Similarly, the testimony of Moellmer and Kelley is largely cumulative of the credibility attacks levied against Brunyer at trial. The evidence provided by Moellmer and Kelley may also be inadmissible if offered to show that Brunyer acted in conformity with prior bad acts. *See* Utah R. Evid. 404(b), 608(b).

tled to any significant weight. As a result of this credibility assessment, the trial court reasoned that the testimony of Robert and Barnes would not have a strong enough impact on a jury to make a different result on retrial probable. We agree.

¶ 79 Robert's testimony is riddled with equivocation and inconsistencies, rendering his credibility highly suspect. To begin with, his story has changed significantly. The trial court found that, sometime after Pinder's conviction, Robert provided Todd Gabler, a defense investigator, with a written statement reflecting comments David Brunyer had made to Robert concerning the murders of Flood and Tanner. The statement Robert provided was consistent with evidence adduced at trial. Robert provided the written statement while he was in jail after being arrested on felony theft charges. Prior to his conviction on those charges, for which he served six months in jail, Robert learned that he had been arrested due to information provided by David. Robert subsequently contacted Pinder's defense team, submitted to interviews, and altered his previous written statement, changing mentions of "John [Pinder] and Filo [Ruiz]" to *"David [Bru-nyer ]* and Filo [Ruiz]." (Emphasis added.)

¶ 80 In addition to Robert's blatant about-face in his written statement, the testimony he provided at the evidentiary hearing is inconsistent in multiple respects with physical evidence gathered during the investigation of the murders and testimony admitted at trial. For example, he stated that a .50 caliber handgun was used in the murders and that David Brunyer injected Tanner with a mix of lion tranquilizers and methamphetamine prior to the time Tanner was killed. However, during the trial, evidence was introduced that a .10 millimeter gun was used in the shooting, and toxicology reports revealed no evidence of tranquilizers or methamphetamine in Tanner's bloodstream. Robert's account also places Pinder in Wyoming on the night of the murders, even though Pinder himself testified that he was at his ranch that night.

¶ 81 Perhaps most important, it appears clear that Robert is now unwilling to state that David Brunyer ever confessed to partici-pating in the murders. At the evidentiary hearing, Robert testified that David Brunyer "didn't come straight out and say he was present, but he knows quite a bit about it. Makes you wonder." Robert also stated that while David Brunyer did not "directly" tell him that he had beaten Tanner with a baseball bat, Robert "believed he did." Given the incompatibility of Robert's testimony with evidence presented at trial and his highly suspect credibility, we determine that the trial court did not abuse its discretion in concluding that the presence of Robert's testimony at a new trial would not result in a more favorable outcome for Pinder.

¶ 82 The testimony of Barnes is similarly of suspect credibility. Barnes, who is currently serving prison time for a theft conviction, was also arrested due to information provided by David Brunyer. Barnes testified that David Brunyer discussed the murders of Flood and Tanner around forty times in her presence and that he confessed his participation in those murders, declaring that Pinder was not present when Flood and Tanner were killed. According to Barnes, other people were present during those conversations "many, many times." However, none of the individuals she identified as being present during those discussions, including her boyfriend Robert, corroborate her testimony.

¶ 83 The trial court concluded that both Robert and Barnes have a motive to retaliate against David Brunyer. The trial court also concluded that the testimony provided by the two witnesses conflicted with each other, as well as with testimony provided by defense witnesses at trial, and that the testimony further failed to mesh with physical evidence admitted at trial.

¶ 84 We agree with the trial court that the weight to be accorded to the testimony of Robert and Barnes is so slight that its impact on a jury would be insignificant. The trial court did not abuse its discretion in determining that the presence of the testimony of Robert and Barnes would not make a more favorable outcome on retrial probable.

#### 4. Joey Silva

¶ 85 The final individual Pinder identifies as a newly discovered witness is a jailhouse informant named Joey Silva. Silva was being held at Duschesne County Jail while Ruiz was an inmate there. According to Silva, Ruiz stated that he "and this white guy, the one that went to the police, killed this female and this other guy." Silva also testified that Ruiz stated that Pinder was not present when the murders occurred.

¶ 86 At the end of the evidentiary hearing, the trial court concluded that "it is difficult to conceive of a less trustworthy witness" than Silva. The trial court's credibility assessment is amply supported by the record. Silva has been convicted of multiple felonies, including a communications fraud conviction stemming from an incident in which Silva attempted to trick a man into posting bail for Silva while under the impression that he was providing bail for his own elderly brother.[15] The State also put forward an impressive amount of evidence undercutting Silva's credibility, including numerous witnesses who cast serious doubt on Silva's veracity. For example, Silva's parole officer testified that Silva was "very deceitful" and "one of the most manipulative individuals [he had] ever known." Another officer who was acquainted with Silva testified that "[a]nything [Silva] says would be very self-serving."

¶ 87 Silva was initially reticent when approached to participate in this case and stated that he would not feel comfortable testifying unless he received a transfer or was paroled. In subsequent interviews with State investigators, Silva refused to have the conversations recorded and stated that if he were called as a witness he would lie. Citing perjury concerns, Silva also refused to sign any statements.

¶ 88 Although the trial court found that Silva was deemed capable of providing accurate information to law enforcement officials at one point in time, that time has since passed. Silva has been terminated as a confidential informant with the recommendation that he never be used again. In fact, testimony given at the evidentiary hearing reveals that even when officers did work with Silva, they were distrustful of his information and would use it only if independent verification was possible.

¶ 89 Given the slight weight to which Silva's testimony would be entitled, the trial court did not abuse its discretion when it concluded that the presence of that testimony would not make a different result on retrial probable.

¶ 90 Even when considered cumulatively, the evidence offered by Pinder's newly discovered witnesses is not sufficient to justify a new trial. This case is not purely a credibility contest. At trial, the jury had the benefit of both physical and testimonial evidence that clashes with the evidence now brought forward by the defense. In light of the suspect credibility of the new witnesses, we cannot say that the trial court abused its discretion in concluding that Pinder's newly discovered evidence does not justify a new trial.

### CONCLUSION

¶ 91 In sum, we conclude that the State did not suppress evidence in violation of its constitutional duty to disclose exculpatory evidence to the defense. Additionally, we hold that Pinder's allegations of evidentiary error were not properly preserved and that any error in jury instruction was invited and therefore not reviewable. Finally, we hold that the evidence underlying Pinder's newly discovered evidence claim either is not "newly discovered" or is entitled to such little weight as to make a different result on retrial highly improbable. Affirmed.

¶ 92 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.

---

**15.** The details of the incident are reported in *State v. Silva*, 2000 UT App 292, ¶¶ 2–8, 13 P.3d 604.