2015 UT App 243

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HAYLEE CHEEK,
Appellant.

Opinion
No. 20120900-CA
Filed October 29, 2015

Fifth District Court, Cedar City Department
The Honorable G. Michael Westfall
No. 071500740

Kelly Ann Booth, Attorney for Appellant

Sean D. Reyes and Ryan D. Tenney, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and JOHN A. PEARCE concurred.

ORME, Judge:

¶1     Appellant Haylee Cheek (Defendant) made a series of incredibly bad decisions, as a result of which she was convicted of aggravated kidnapping and aggravated robbery, both first degree felonies; theft of a firearm, a second degree felony; possession of methamphetamine and unlawful acquisition of a financial transaction card, both third degree felonies; and sexual battery, a class A misdemeanor. She appeals those convictions. We affirm.

BACKGROUND[1]

¶2    Shortly before Christmas in 2007, Defendant and her friend, Ron Parker, drove to Brian Head Ski Resort to break into cars. While Parker acted as a lookout, Defendant broke into a truck and stole a wallet containing a credit card and a gas card. On their way home from the ski resort, they gassed up their car using one of the stolen cards. A few days later, Defendant and another friend, Tiffani Davis, drove back to Brian Head Ski Resort. Defendant again broke into several cars while Davis acted as a lookout. Defendant stole a handgun from one of the cars.

¶3    On December 28, 2007, Defendant was in a hotel room in Mesquite, Nevada, with two friends, Ambree Blackner and Uriah Suhr. While the group smoked methamphetamine, Defendant told them about the gun she had stolen a week earlier, and Suhr agreed to buy it from her later that day in Cedar City, Utah.

¶4    That afternoon, Suhr and his girlfriend drove to Cedar City. Before meeting up with Defendant, Suhr decided to burglarize Blackner's home, but he was interrupted by Blackner's father. When confronted by Blackner's father, Suhr claimed that he was looking for Blackner and left. Blackner's father was on his way out of town when he encountered Suhr, and because he was suspicious of Suhr, he called the police and

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. "We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

asked them to watch his home while he was gone. The police agreed to do so.

¶5    Later that day, Suhr and his girlfriend picked up Defendant, Defendant's son, and Blackner. The group drove to Defendant's home to retrieve the stolen handgun and then drove to Blackner's house. At Blackner's house, the group began using methamphetamine supplied by Suhr's girlfriend.

¶6    Shortly before midnight, an officer stopped by to check on the house and spoke with Blackner on the porch. The officer's knock on the door awoke Suhr's girlfriend. Worried that officers might come back and search the house, she called a friend to take her home, and they agreed to meet at a nearby truck stop. The girlfriend was also worried that officers would find contraband on Suhr (who had had a seizure and passed out) if they came back to search the house, so she took a small vial of drugs from Suhr's pocket, along with some money.

¶7    As the girlfriend was getting ready to leave for the truck stop, Davis arrived at the home with Ashleigh Walker. Defendant told Davis that she had seen the girlfriend taking things from Suhr's pockets. Defendant and Davis then decided to rob the girlfriend. When Suhr woke up, Defendant told him what had happened and he agreed to loan Davis the handgun, which he had purchased from Defendant earlier that day.

¶8    Davis offered to drive Suhr's girlfriend to the truck stop where she was supposed to meet her friend. The girlfriend, Davis, and Walker got in Davis's car, and as the group pulled out of the driveway, a police officer began following them. This concerned the girlfriend, so she took the small vial of drugs she had taken from Suhr and hid it inside her vagina. When the officer stopped following them, Davis drove back to Blackner's house instead of taking the girlfriend to the truck stop.

¶9    Once they were back at Blackner's house, Davis got out of the car and started talking to Suhr. Sensing trouble, Suhr's

girlfriend hid the money that she had taken from Suhr between the seats of the car. When Davis got back into the car, she pulled out the handgun, pointed it at Suhr's girlfriend, told her she was robbing her, and demanded the drugs and the money. When the girlfriend said that she did not have them, Davis hit her in the face with the gun. Davis then unsuccessfully searched the girlfriend's purse and went inside the house while Walker stayed outside the car to make sure the girlfriend "couldn't get out" of the car.

¶10    While she was waiting in the car, the girlfriend saw a cell phone on the seat and used it to call 911. She told the 911 dispatcher where she was, that "there was a gun," and that she "needed help." The girlfriend hung up when Davis came back outside with Defendant.

¶11    Davis made the girlfriend get out of the car, whereupon she and Defendant pushed the girlfriend into the garage. Inside the garage, Defendant and Davis knocked the girlfriend to the ground and, again, unsuccessfully searched her for the drugs and money. The two women then took the girlfriend into an adjoining workroom. When the girlfriend tried to escape, Defendant grabbed her by the hair, pulled her to the ground, hit her, and tied her up with rope. At that point, Walker came into the workroom, placed duct tape over the girlfriend's mouth, and went back inside.

¶12    Defendant told Davis to search the girlfriend's vagina for the drugs, but Davis refused to touch the girlfriend (hereafter, "the Victim") and started searching for pliers or gloves to use in extracting the drugs. Although she could not see what was happening, the Victim testified that the women used one "cold object" and one "rough object" to search her vaginal cavity for the vial of drugs. Using the "rough object," Davis extracted the vial of drugs from the Victim's vagina and handed it to Defendant. Around that time, Walker returned to the workroom and reported that she had found the money in the car.

Defendant and Davis then released the Victim and told her to put her clothes back on. Shortly thereafter, the police arrived at the home.

¶13 One officer looked inside the workroom and saw Davis and the Victim. He later testified that the Victim appeared "very nervous" and "visibly upset"; that her "face was red, bruised," and swollen; and that blood was coming out of one of her nostrils. He also noticed a rope, a glove, and a "pair of panties" on the floor in the workroom. Davis claimed that the Victim's boyfriend had beaten her up and that Davis had brought her to the workroom to see if she could help her. The Victim, however, told the officer that she had "been beaten up" by "three to four girls" and that "all the girls were involved." She also identified Defendant and Davis as being "responsible for the assault."

¶14 A short time later, another officer arrived at the house and found Defendant huddled in a "well darkened" corner of the garage with her head down and her hands covering her face. When the officer asked Defendant why she was hiding in the garage, Defendant told him she was "doing nothing" and that she was "not involved in what's going on here." Thereafter, officers located a duffel bag near where Defendant had been hiding and found the gas card that was stolen from the truck parked at Brian Head Ski Resort inside. After obtaining a search warrant for Defendant's car, the officers also found a checkbook belonging to a California resident who had been vacationing at the ski resort during the week of Christmas.

¶15 During her several interviews with police, Defendant offered conflicting stories. She initially stated that she "didn't have anything to do with this," that "she didn't even know why she was there," and that "[s]he was innocent." But later that day, she stated that she had been sleeping when she heard voices, so she went to the garage. When she heard the police, she "sat down in the garage in an effort to hide from them." She also claimed that she did not know Suhr or anything about the

handgun. Later that day, when a detective asked her about her "part in this," Defendant replied, "Look, [Suhr] pointed a gun to my son's head and threatened my son that if I didn't cooperate, he'd kill my son." About a week later, Defendant contacted officers and requested a meeting, during which she told them that she had heard that a vial of drugs had been hidden inside of the Victim's vagina but that it had since been hidden inside the Blackner home. She described the exact location of the vial. Based on this information, officers obtained a search warrant and found the vial inside a cabinet containing syringes and drugs.

¶16    Defendant was subsequently charged with aggravated robbery, aggravated kidnapping, object rape,[2] theft by receiving stolen property, aggravated assault, possession of a firearm by a restricted person, possession of drug paraphernalia, and possession of methamphetamine. Defendant was also charged with theft of a firearm; however, when the federal government decided to prosecute Defendant for theft of a firearm, the State filed an amended information, dropping this charge and the theft-by-receiving charge. Ultimately, the federal government decided not to prosecute Defendant, and the State, in a separate case, recharged Defendant with theft of a firearm, along with a new charge of unlawful acquisition of a financial transaction card. At a June 22, 2010 hearing, Defendant's trial counsel agreed with the State's request to consolidate the two cases.

¶17    At trial, the Victim, Davis, Walker, and Blackner testified about Defendant's role in the robbery of the Victim. Davis and Parker testified about Defendant's role in the thefts at Brian Head Ski Resort, and Walker and Blackner both testified that Defendant had told them about the thefts. Several police officers

---

2. The object-rape charge was eventually dismissed and replaced with the charge of sexual battery.

also testified about how they found Defendant hiding in Blackner's garage and her subsequent inconsistent stories. Defendant, on the other hand, testified that she was innocent of all the charges against her. A jury convicted Defendant of aggravated robbery, aggravated kidnapping, sexual battery, aggravated assault, possession of methamphetamine, theft of a firearm, and unlawful acquisition of a financial transaction card.

¶18    After the trial, Defendant's current counsel entered her appearance, whereupon Defendant moved to arrest judgment, arguing that her aggravated kidnapping and aggravated assault convictions should both merge into her aggravated robbery conviction. The trial court granted her motion with respect to her aggravated assault conviction and denied it with respect to her aggravated kidnapping conviction.

¶19    Defendant also filed a motion for new trial, raising several claims of ineffective assistance of counsel. Most notably, Defendant claimed that she had entered into a sexual relationship with her trial counsel after retaining him and that she had broken up with him shortly before trial. She alleged that their sexual relationship and breakup resulted in a conflict of interest. She also alleged numerous instances of ineffective assistance of counsel regarding trial counsel's investigative and tactical decisions. Finally, Defendant requested a new trial based on newly discovered evidence—a letter from her former cellmate claiming that Davis had told the cellmate that she fabricated her trial testimony.

¶20    In response to Defendant's claims, trial counsel submitted an affidavit, which was ultimately accepted as evidence by the trial court. Trial counsel denied having a sexual relationship with Defendant and provided explanations for each of his trial decisions in question. After an evidentiary hearing, the trial court denied Defendant's motion for new trial. The court did not resolve the factual dispute as to whether Defendant and trial counsel engaged in a sexual relationship. Instead, the court

concluded that "even if the facts claimed by Defendant in fact occurred, it did not affect [trial counsel's] performance at trial, which was fair in all material respects." The court also concluded that the alleged ineffective assistance "did not, either individually or cumulatively, result in any harm or prejudice to Defendant's rights." Finally, the court denied Defendant's newly-discovered-evidence claim, stating that it was "mere impeachment evidence that would not likely have affected the result at trial, given the number of witnesses supporting Ms. Davis's account." Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶21   First, Defendant contends that the trial court erred in failing to compel the testimony of a witness at trial. Defendant's claim is unpreserved and she therefore seeks review under the plain error exception to the preservation requirement. "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the [trial] court." *State v. Waterfield*, 2014 UT App 67, ¶ 18, 322 P.3d 1194.

¶22   Second, Defendant contends that her trial counsel was constitutionally ineffective and that the trial court erred in denying her motion for new trial on the basis of ineffective assistance of counsel. "When reviewing a trial court's ruling on ineffective assistance of counsel claims, we utilize a mixed standard of review." *State v. Stidham*, 2014 UT App 32, ¶ 15, 320 P.3d 696. "We review the trial court's application of the law to the facts under a correctness standard. If there are factual findings to review, we will not set them aside unless they are clearly erroneous." *State v. Lenkart*, 2011 UT 27, ¶ 20, 262 P.3d 1 (citation footnotes omitted).

¶23   Third, Defendant contends that the trial court erred when it consolidated the two cases. She contends that this "matter should be reviewed under the doctrines of plain error and/or

ineffective assistance of counsel." The appropriate standards of review for Defendant's plain-error and ineffective-assistance claims are as already explained. *See supra* ¶¶ 21–22.

¶24 Fourth, Defendant contends that the trial court erroneously denied her motion for new trial based on newly discovered evidence. And fifth, she contends that the trial court erroneously denied her motion for new trial when it concluded "that the errors of Trial Counsel, either individually or collectively[,] did not prejudice [D]efendant." "The denial of a motion for a new trial is reviewed under an abuse of discretion standard." *Stidham*, 2014 UT App 32, ¶ 14.

ANALYSIS

I. Defendant's Right to Compulsory Process Was Not Denied.

¶25 Defendant contends that the trial court should have compelled the testimony of a witness, Kibb Jones, because his testimony could have been used to impeach the credibility of the State's key witness, the Victim. Defendant asserts that this issue was preserved "when Kibb Jones was called to testify, and he refused." The State responds that Defendant failed to preserve this claim in the trial court because trial counsel "never asked the court to threaten [Jones] with sanctions if he did not testify."

¶26 We agree with the State that this issue is not preserved for appeal. To preserve an issue for appeal, "the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (citation and internal quotation marks omitted). "This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding." *Id.* In this case, trial counsel never asked the court to threaten Jones with sanctions, and the trial court therefore never had an opportunity to rule on

the issue or otherwise compel Jones to testify. *See id.* Accordingly, Defendant's compulsory-process claim is unpreserved.

¶27  In the alternative, Defendant argues that we should review her claim under the plain error exception to the preservation rule. To show plain error, Defendant must prove that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

¶28  The day before Jones was scheduled to testify, trial counsel informed the trial court that Jones had indicated that he would not testify. Trial counsel told the court that if Jones refused to testify, he wanted "some record that he's unavailable" so that Defendant's investigator could "then testify without it being hearsay as to what [Jones] said to [the investigator in] an interview." *See* Utah R. Evid. 804(a)(2). The next day, when Jones was called to the stand, he indeed refused to testify. During the ensuing colloquy, the trial court informed Jones, "Now as a practical matter, all I can do is hold you in contempt and have you serve some time in contempt." The court noted that Jones was already in prison and that there was "not a whole lot" it could "do to encourage" Jones to testify. When the prosecutor asked if the court could order Jones to testify, the court responded, "Well, of course, I can order him to testify, but he's already indicated he's not going to comply with my order. Isn't that right?" After Jones again refused to testify, the court declared him unavailable.

¶29  As a result, the trial court allowed Defendant's investigator to testify about his conversations with Jones. Defendant's investigator testified about Jones's opposition to testifying and that Jones had told him the night before that the Victim wrote him several letters, one of which stated that Suhr,

not Defendant, was behind the robbery. In rebuttal, the State called its own investigator, who testified that during a recorded interview, Jones "unequivocally" denied receiving any letters from the Victim.

¶30   Even if the trial court erred by not ordering Jones to testify, Defendant has not shown that the error was obvious. *See Dunn*, 850 P.2d at 1208. To begin with, because Jones was already in prison, a threat of contempt sanctions was unlikely to be effective in persuading him to testify. And the trial court could not force Jones to testify. *See State v. Barela*, 779 P.2d 1140, 1144 (Utah Ct. App. 1989) ("[I]t is clear that a witness who[—]though present—refused to testify is just as surely unavailable as the witness who stepped across a state line to avoid service of a subpoena.") (citation and internal quotation marks omitted). Accordingly, the error, if any, was not obvious.

¶31   Moreover, even if the trial court's failure to order Jones to testify was obvious error, Defendant has not shown, or even argued, that there was a reasonable likelihood of a more favorable outcome at trial absent the error. *See Dunn*, 850 P.2d at 1208. Defendant cannot show that the trial court's threat of sanctions would have compelled Jones to testify, let alone that he would have testified in her favor if he had testified. *Cf. State v. Schreuder*, 712 P.2d 264, 275 (Utah 1985) ("Testimony is material, and its exclusion is therefore prejudicial, if there is a reasonable probability that its presence would affect the outcome of the trial."). Besides, the jury ultimately heard Jones's claims about Defendant's lack of involvement with the robbery when Defendant's investigator testified about his conversations with Jones. But Defendant's investigator's testimony was contradicted by the State's investigator's testimony and by the testimony of multiple other witnesses who observed Defendant's assault and robbery of the Victim. Consequently, Defendant cannot establish that there was a reasonable likelihood of a more favorable outcome at trial had Jones testified. *See Dunn*, 850 P.2d at 1208. Because we conclude that any alleged error was not obvious and

did not result in prejudice, Defendant's plain-error claim has no merit.

¶32 Defendant also raises the issue of ineffective assistance of counsel as an alternate means to have the alleged error examined on appeal. She asserts that trial counsel provided ineffective assistance "by failing to argue for the trial court to compel Jones'[s] testimony." To establish her claim of ineffective assistance of counsel, Defendant "must show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, "[f]ailure to meet the plain error requirement of prejudice means that defendant likewise fails to meet the required showing under the ineffective assistance of counsel standard." *State v. Ellifritz*, 835 P.2d 170, 174 (Utah Ct. App. 1992). Because we concluded above that Defendant cannot demonstrate prejudice on this issue, *see supra* ¶ 31, her ineffective-assistance claim on this point necessarily fails.[3]

## II. The Trial Court Did Not Err When It Denied Defendant's Motion for New Trial on the Basis of Ineffective Assistance of Counsel.

### A. Trial Counsel Did Not Have an Actual Conflict of Interest.

¶33 Defendant claims that her trial counsel was constitutionally ineffective because he had an actual conflict of interest and that prejudice is therefore presumed. Specifically,

---

3. In any event, Defendant cannot establish deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), because any request by trial counsel to order Jones to testify would have been futile given his refusal to testify. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

she alleges that she and trial counsel had a sexual relationship that ended shortly before trial when she broke up with him. She alleges that after she ended the relationship, trial counsel took several positions contrary to her interests. The trial court declined to resolve the factual dispute as to whether Defendant and trial counsel engaged in a sexual relationship but concluded that "even if the facts claimed by Defendant in fact occurred, it did not affect [trial counsel's] performance at trial, which was fair in all material respects."

¶34  "The sixth amendment right to effective assistance of counsel includes the right to counsel free from conflicts of interest." *State v. Webb*, 790 P.2d 65, 72 (Utah Ct. App. 1990). Ordinarily, ineffective assistance claims are analyzed under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a defendant to demonstrate both that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* at 687. However, the United States Supreme Court has held that

> a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.

*Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980) (internal citation omitted). *See also, e.g., State v. Brandley*, 972 P.2d 78, 85 (Utah Ct. App. 1998) ("[W]hen an ineffectiveness claim is grounded on a conflict of interest, we presume prejudice if the defendant demonstrates that an actual conflict of interest adversely affected his lawyer's performance.") (citation and internal quotation marks omitted); *People v. Doolin*, 198 P.3d 11, 33 (Cal. 2009) ("In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under

an actual conflict of interest *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.") (emphasis in original) (citation and internal quotation marks omitted).

¶35    To "establish an actual conflict, [the defendant] must demonstrate as a threshold matter . . . that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997) (alteration and omission in original) (citation and internal quotation marks omitted). "[H]ypothetical or speculative conflicts will not suffice to establish a violation." *State v. Humphrey*, 793 P.2d 918, 923 (Utah Ct. App. 1990).

¶36    "The most likely scenario for a conflict of interest to develop is when an attorney represents two co-defendants in the same case, i.e., multiple or joint representation." *Thompson v. State*, 94 S.W.3d 11, 16 (Tex. App. 2002). Indeed, *Cuyler* addressed a situation in which the defendant's lawyers concurrently represented two co-defendants with conflicting interests. 466 U.S. at 337–38. *See also Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) ("*Cuyler*, like all the other Supreme Court cases that have discussed a lawyer's conflict of interest, solely concerned the representation of multiple clients."). Although the Supreme Court observed that "a possible conflict inheres in almost every instance of multiple representation," *Cuyler*, 446 U.S. at 348, it also concluded that "a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel," *id.* "Such a presumption would preclude multiple representation even in cases where [a] common defense . . . gives strength against a common attack." *Id.* (alteration and omission in original) (citation and internal quotation marks omitted). The Court held that "[i]n order to establish a violation of the Sixth Amendment, a defendant . . . must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.*

¶37 In this case, the "conflict" between Defendant and trial counsel was not of the same nature as the conflict at issue in *Cuyler*, i.e., one in which a division of loyalties between clients impacts counsel's representation. Although we recognize the potential for an attorney's interests to diverge from his or her client's interests in cases like the instant one, "the possibility of conflict is insufficient to impugn a criminal conviction." *See id.* at 350. Defendant must still demonstrate "that an actual conflict of interest adversely affected [her] lawyer's performance." *See id.*

¶38 The limited number of courts faced with an ineffective-assistance claim based on a sexual relationship have reached the same conclusion. For example, in *United States v. Babbitt*, 22 M.J. 672 (A.C.M.R. 1986), a defense attorney admitted to engaging in sexual relations with his client on the eve of the last day of trial. *See id.* at 677. On appeal, the Army Court of Military Review rejected the defendant's argument that "an attorney's sexual relations with his client per se create an actual conflict of interest which violates the client's Sixth Amendment right to effective assistance of counsel." *Id.* The court noted that while it did not condone the defense attorney's conduct, which was a proper subject for professional discipline, it was "not prepared to say that the Sixth Amendment and the Sixth Commandment are coextensive."[4] *Id. See id.* n.7. *See also, e.g., Ronald W. v. Gina P.W.*, No. 203503/2000, 2001 WL 1327323, at *3 (N.Y. Sup. Ct. Aug. 13,

---

4. We recognize that different religious traditions divide the Ten Commandments in different ways. *See* Ten Commandments, https://en.wikipedia.org/wiki/Ten_Commandments (last visited August 18, 2015). But we interpret the Sixth Commandment referenced by the court in *United States v. Babbitt*, 22 M.J. 672, 677 (A.C.M.R. 1986), to be "Thou shalt not commit adultery," not "Thou shalt not kill," which is often cited as the Sixth Commandment. *See* Ten Commandments, https://en.wikipedia.org/wiki/Ten_Commandments (last visited Aug. 18, 2015).

2001) ("There is no rule that sexual relations between defense counsel and the defendant during his representation of the defendant per se creates a conflict of interest which violates the defendant's right to effective assistance of counsel."). The court further concluded that "the conflict must be actual rather than potential, which is to say that it must adversely affect the lawyer's performance." *Babbitt*, 22 M.J. at 677.

¶39 In this case, Defendant argues that her sexual relationship with trial counsel created an actual conflict of interest because it violated rule 1.8(j) of the Utah Rules of Professional Conduct, which provides, "A lawyer shall not engage in sexual relations with a client that exploit the lawyer–client relationship." Utah R. Prof'l Conduct 1.8(j). "'[S]exual relations' means sexual intercourse or the touching of an intimate part of another person for the purpose of sexual arousal, gratification, or abuse[.]" *Id.* R. 1.8(j)(1).

¶40 The alleged behavior is no doubt a proper subject for professional discipline, and indeed we are advised that the Utah State Bar's Office of Professional Conduct has filed a disciplinary complaint against trial counsel. Nonetheless, the Utah Supreme Court has previously held that "a violation of the Utah Rules of Professional Conduct does not, by itself, constitute ineffective assistance." *Menzies v. State*, 2014 UT 40, ¶ 162, 344 P.3d 581. Moreover, even though Defendant allegedly broke up with trial counsel shortly before trial, it is well settled that an "acrimonious relationship" between a defendant and her counsel "is not the basis for a conflict of interest." *See Gardner v. Holden*, 888 P.2d 608, 621 (Utah 1994). *See also State v. Graham*, 2012 UT App 332, ¶ 28, 291 P.3d 243 (concluding that a defendant who "repeatedly bickered on the record" with trial counsel "clearly experienced 'conflict' in the colloquial sense" but that this did not amount to a legal conflict of interest). Rather, Defendant must establish that the sexual relationship created an actual conflict. She must demonstrate that trial counsel "was required to make a choice advancing his own

interests to the detriment of his client's interests." *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997) (citation and internal quotation marks omitted). Importantly, Defendant "has the burden of demonstrating with specificity that the actual conflict existed and adversely affected [trial counsel's] performance." *State v. Brandley*, 972 P.2d 78, 85 (Utah Ct. App. 1998). Defendant argues that the alleged sexual relationship resulted in an actual conflict in three ways: (1) it led counsel to have her sign a malpractice waiver, (2) it "led him to attempt to rid himself of the case," and (3) it "caused him to betray the attorney–client privilege."

¶41 Defendant first contends that the malpractice waiver created a conflict of interest because it violated rule 1.8(h)(1) of the Utah Rules of Professional Conduct, which prohibits a lawyer from making "an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement." Utah R. Prof'l Conduct 1.8(h)(1). The signed waiver provides:

> I, [Defendant], hereby waive[] any claims against [trial counsel] and/or [trial counsel's firm] for a conviction in my Cedar City District Court case . . . . I know I could plead guilty to one first degree felony, aggravated robbery and enter the plea without admitting culpability and all other charges associated with this case would be dismissed. I understand that if I go to trial on all charges [it is trial counsel's] legal opinion that I stand an extremely high chance of being convicted on all counts and that the prison time I would receive may be substantially higher as well as the very real possibility of being placed on the sex offender registry for the rest of my life. Despite these risks, I have chosen not to follow his advice. I wish to go to trial. I understand that [trial counsel] is ready willing and able to do the trial and he will give his

> best efforts in the trial, but despite those efforts he
> feels this is an inadvisable course of action.

¶42 It is evident that the purpose of the waiver is mischaracterized by Defendant. Its purpose was not to protect trial counsel from malpractice claims generally but to explicitly memorialize the fact that the decision to go to trial was Defendant's rather than trial counsel's, and that it was a decision that was contrary to trial counsel's advice. Furthermore, even if the waiver did violate rule 1.8(h)(1), it did not result in an actual conflict. As previously discussed, "a violation of the Utah Rules of Professional Conduct does not, by itself, constitute ineffective assistance." *Menzies*, 2014 UT 40, ¶ 162. And Defendant has failed to show that trial counsel "made a choice advancing his own interests" to her detriment—she has failed to indicate how her alleged sexual relationship with trial counsel prompted trial counsel to seek the waiver. *See id.* (citation and internal quotation marks omitted). But more importantly, the language of the waiver leads us to the opposite conclusion from that urged by Defendant. The waiver was not an act of retaliation stemming from Defendant's and trial counsel's failed relationship; it was principally part of trial counsel's effort to convince Defendant to accept a favorable plea deal over going to trial—and, no doubt, an attempt to make a record in the event Defendant rejected his advice and later regretted it. Thus, trial counsel's decision to seek a waiver was not, as Defendant claims, an effort to put his interests ahead of hers but, as hindsight confirms, a reasonable choice on his part. *See State v. Person*, 2006 UT App 288, ¶ 17, 140 P.3d 584 ("To show that the alleged conflict adversely affected trial counsel's performance, Defendant must establish that (1) other counsel likely would have approached the case differently and (2) a tactical reason other than the alleged conflict [did not] exist[ ] for [counsel's] decisions.") (alterations in original) (citation and internal quotation marks omitted). Accordingly, Defendant's conflict-of-interest claim regarding the waiver fails.

¶43   Second, Defendant contends that trial counsel attempted to "rid himself of the case" by withdrawing from the case and orchestrating the appearance of substitute counsel to take over Defendant's case. Defendant argues that trial counsel emailed substitute counsel and suggested that she take over Defendant's case. According to Defendant, substitute counsel informed trial counsel that she lacked experience with criminal cases because she focused on civil litigation, and trial counsel nevertheless "prepared and filed a substitution of counsel . . . in this extraordinarily complicated and delicate criminal case less than a month before trial began," indicating that trial counsel "no longer cared about the interests of his client."

¶44   Even assuming that Defendant established the existence of an actual conflict of interest, she has nonetheless failed to demonstrate, or even allege, that trial counsel's alleged actions regarding substitute counsel "adversely affected trial counsel's performance." *See Person*, 2006 UT App 288, ¶ 17. *See also Taylor*, 947 P.2d at 688 (concluding that the defendant failed to demonstrate an actual conflict of interest where he "failed to allege, let alone identify, anything in this particular case to support the theory that *his* defense suffered") (emphasis in original). We note that although this sequence of events occurred just a few weeks before Defendant's trial, and that trial counsel temporarily withdrew from the case, trial counsel had been acting as counsel for Defendant for almost a year, and nothing in the record indicates, nor has Defendant identified, how trial counsel's brief withdrawal from the case prevented him from being adequately prepared for trial once he re-entered his appearance. Defendant has also failed to identify how the break in representation adversely affected the quality of trial counsel's actual representation at trial. In sum, even if a conflict existed, Defendant has failed to demonstrate that it adversely affected trial counsel's performance. *See State v. Brandley*, 972 P.2d 78, 85–86 (Utah Ct. App. 1998).

¶45 Finally, Defendant contends that trial counsel's stipulation to the admissibility of a blood draw showing that Defendant had used methamphetamine on the night of the robbery "disregarded his duty to his client in an attempt to forward his personal interest in gaining credibility with the Court."

¶46 After Defendant was arrested, a nurse drew her blood, which tested positive for methamphetamine. In February 2009, Defendant's trial counsel successfully moved to suppress the blood draw and test results. Subsequently, at Defendant's trial, several of the State's witnesses testified about the effects of methamphetamine, such as hallucinations, paranoia, and jitteriness. Additionally, Davis, Suhr, and Blackner testified that on the night of the Victim's robbery, they saw Defendant use methamphetamine. On the fourth day of trial, the prosecutor stated that even though the blood draw evidence had been suppressed, he had subpoenaed the nurse who had performed the blood draw. He further explained that if Defendant chose to testify and denied using methamphetamine, he would introduce the blood draw evidence to impeach her testimony.

¶47 Later that afternoon, during a sidebar conference, trial counsel told the court that Defendant "wants to testify" and would "be admitting methamphetamine use." The nurse, however, was scheduled to go out of town that night, and Defendant was not scheduled to testify until the next day. To resolve the potential scheduling problem, trial counsel proposed a contingent stipulation under which the defense agreed that if Defendant testified she had not used methamphetamine, the blood-draw evidence could be admitted in place of the nurse's in-court testimony. The next day, as promised, Defendant testified that she had used methamphetamine. Consequently, the stipulation was never disclosed to the jury.

¶48 Although trial counsel's contingent stipulation is atypical, Defendant has nevertheless failed to establish how her alleged

sexual relationship with trial counsel led him to stipulate to the contingent admission of the blood draw evidence. And even if Defendant could demonstrate a causal connection, she has failed to prove that no "tactical reason other than the alleged conflict" existed. *See State v. Person*, 2006 UT App 288, ¶ 17, 140 P.3d 584 (citation and internal quotation marks omitted). Here, we can discern a tactical reason for trial counsel's contingent stipulation. First, Defendant had little to gain from denying that she used methamphetamine, as several witnesses had already testified that she did so on the night in question. But more importantly, trial counsel used Defendant's admitted methamphetamine use during closing argument to explain her odd behavior on the night she was arrested, i.e., why she sat silently in a dark corner of Blackner's garage for an hour after the police arrived. Relying on testimony regarding methamphetamine's side effects, trial counsel emphasized that methamphetamine makes a person "paranoid and scared" and more likely to "run away" and "hide" when there are signs of trouble. Thus, by embracing Defendant's methamphetamine use, trial counsel was able to attribute Defendant's behavior on the night of the robbery, including her efforts to hide from the police, to her methamphetamine use as opposed to her involvement in the more serious criminal activity. We therefore decline to view trial counsel's contingent stipulation as proof of an actual conflict.

¶49 In summary, we reject Defendant's argument that trial counsel labored under a conflict of interest due to his alleged sexual relationship with Defendant. Defendant has failed to establish that an actual conflict occurred, i.e., that trial counsel was required to make a choice advancing his interests to her detriment. *See State v. Taylor*, 947 P.2d 681, 686 (Utah 1997). And in any event, she has failed to establish that the "alleged conflict adversely affected trial counsel's performance." *See Person*, 2006 UT App 288, ¶ 17. The trial court concluded that trial counsel's performance at trial "was fair in all material respects." While trial counsel's alleged sexual relationship with Defendant may have violated the Utah Rules of Professional Conduct,

Defendant has not demonstrated that it adversely affected his representation of her interests. Consequently, Defendant is not entitled to a presumption of prejudice under *Cuyler* and her ineffective-assistance claim based on a conflict of interest fails. The trial court did not err in denying her motion for new trial on this basis.

B.      Defendant Fails to Demonstrate That Trial Counsel Was Ineffective Under *Strickland*.

¶50     The Sixth Amendment grants criminal defendants the "right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation and internal quotation marks omitted). *See id.* at 685. Under *Strickland*, Defendant must demonstrate both that trial "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* at 687. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted). Moreover, "[t]o show prejudice . . . the defendant bears the burden of proving that counsel's errors actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different." *State v. Ott*, 2010 UT 1, ¶ 40, 247 P.3d 344 (second omission in original) (citation and internal quotation marks omitted). "If a defendant fails to establish either of the two parts of the *Strickland* test, counsel's assistance was constitutionally sufficient, and we need not address the other part of the test." *State v. Medina-Juarez*, 2001 UT 79, ¶ 14, 34 P.3d 187.

¶51     Defendant first contends that even if her conflict-of-interest claim fails, the four issues raised there should be separately analyzed under *Strickland*. Defendant offers no

additional analysis under *Strickland* with regard to these four claims. She simply asserts, "This section incorporates by reference all preceding section[s] of the argument[.]" However, we previously concluded that Defendant is not entitled to a presumption of prejudice under *Cuyler*. *See supra* ¶ 49. Consequently, because Defendant has failed to include any specific prejudice analysis, let alone demonstrated prejudice, with regard to these four claims, her ineffective-assistance claims necessarily fail under *Strickland*. *See Medina-Juarez*, 2001 UT 79, ¶ 14.

¶52    Defendant also alleges numerous additional instances of ineffective assistance of counsel to be evaluated under *Strickland*. We discuss each in turn.

¶53    First, Defendant argues that trial counsel was ineffective when he "failed to adequately investigate, as evidenced by his failure to issue timely subpoenas." Specifically, she asserts that trial counsel did not issue a subpoena for a "single witness" because he believed "the matter would be continued." But trial counsel did call and examine several witnesses. We therefore presume that Defendant's claim is that trial counsel should have called additional witnesses. However, because Defendant "does not identify the [additional] witnesses or the content of their expected testimony," she has failed to establish either deficient performance or prejudice. *See State v. Gunter*, 2013 UT App 140, ¶ 33, 304 P.3d 866.

¶54    Second, Defendant argues that trial counsel was ineffective when he failed to give proper notice of an alibi witness—Defendant's father. Beyond Defendant's bare assertion that the alibi witness could "provide exculpatory testimony pertaining to the theft and credit card related charges," Defendant has not stated what the alibi witness's testimony would be or how that testimony would have created a reasonable likelihood of a different outcome at trial.

Accordingly, Defendant has again failed to establish either deficient performance or prejudice.

¶55 Third, Defendant argues that "[t]rial counsel was ineffective when he failed to object to Sergeant Sheldon Barney's expert testimony" when Barney was asked "to testify about the effects of methamphetamine, and to opine as to whether Tiffani Davis and/or [Defendant] exhibited signs of drug intoxication, and conversely if [the Victim's] jitters were unrelated to drug intoxication." Specifically, Defendant asserts that "[n]o foundation was ever provided for Mr. Barney's expertise, nor was he ever noticed to be an expert witness."

¶56 Our review of the record indicates that Sergeant Barney was not initially called to testify as an expert witness even though he arguably veered into giving expert testimony when he testified about the effects of methamphetamine. Nevertheless, even if trial counsel performed deficiently by not objecting to questions about the effects of methamphetamine, Defendant has not established how objecting to Barney's testimony would have created a reasonable likelihood of a different result at trial, *see Medina-Juarez*, 2001 UT 79, ¶ 15, 34 P.3d 187, especially given that the jury heard testimony from two other witnesses about the effects of methamphetamine. And nothing in the record suggests that Barney would not have been qualified as an expert witness had trial counsel objected.

¶57 Likewise, Defendant has not established how objecting to a question from the jury about whether Davis or Defendant appeared to be on methamphetamine on the night of the robbery would have created a reasonable likelihood of a different result at trial. *See id*. This is especially so where, as here, Defendant admitted to using methamphetamine during her testimony and trial counsel embraced her methamphetamine use during closing argument to explain her odd behavior on the night she was arrested. Consequently, this ineffective-assistance claim fails for lack of prejudice.

¶58 Finally, Defendant argues that "[t]rial counsel was ineffective when he failed to argue that the aggravated robbery and aggravated kidnapping charges should merge." Defendant was convicted on July 16, 2010. On July 20, 2010, trial counsel filed a motion to withdraw, stating, "Client wishes to hire other counsel." On August 3, 2010, the trial court denied, without prejudice, trial counsel's motion to withdraw. But on August 11, 2010, another attorney entered an appearance as Defendant's counsel and filed a motion to vacate Defendant's aggravated kidnapping conviction. Thereafter, on August 25, 2010, Defendant's current counsel entered an appearance as Defendant's counsel. Before Defendant's sentencing, current counsel filed a motion to arrest judgment, arguing that (1) Defendant's aggravated kidnapping charge should merge into her aggravated robbery charge and (2) her aggravated assault charge should merge into her aggravated robbery charge under the lesser-included-offense doctrine. The trial court merged Defendant's aggravated assault and aggravated robbery charges but declined to merge the aggravated kidnapping and aggravated robbery charges. Defendant's claim that trial counsel was ineffective for failing "to argue that the aggravated robbery and aggravated kidnapping charges should merge" is, accordingly, without merit.

¶59 While the argument is a bit confusing, to the extent Defendant intends to argue that trial counsel should have made a merger argument before trial, Defendant misunderstands the law. "Courts apply the merger doctrine as one means of alleviating the concern of double jeopardy that a defendant should not be punished twice for the same crime." *State v. Lopez*, 2004 UT App 410, ¶ 8, 103 P.3d 153. However, "[t]he merger doctrine does not apply before trial because the double jeopardy protections attach only when an accused is put on trial . . . and a jury has been sworn and impaneled." *Id.* (omission in original) (citation and internal quotation marks omitted). Therefore, "the protections provided by the merger doctrine are not applicable before trial." *Id.* "The trial court cannot assess whether . . . one

charge merges into another until the prosecution has presented its case and the jury has convicted the defendant of multiple charges." *Id.* Thus, trial counsel was not ineffective for failing to make a pretrial motion to merge the charges. *See id.* ¶ 9.

¶60　Moreover, to the extent Defendant is arguing that trial counsel should have made a merger argument after her conviction, this claim is equally without merit because Defendant's current counsel entered an appearance and moved to arrest judgment, before sentencing, on the same grounds Defendant now faults trial counsel for failing to argue. The trial court ruled on Defendant's merger arguments on the merits and even merged her aggravated assault and aggravated robbery charges. And Defendant does not assert that the trial court erred in its rulings. Consequently, Defendant's ineffective-assistance claim fails because she has not established how an earlier merger motion, as opposed to the one current counsel filed, would have created a reasonable likelihood of a better result for Defendant. Accordingly, the trial court did not err in denying Defendant's motion for new trial on ineffective-assistance grounds.

### III. The Trial Court Did Not Err When It Consolidated the Robbery and Theft Cases.

¶61　Defendant next argues that the trial court erred when it "improperly consolidated two separate criminal episodes into one trial," i.e., the robbery and theft cases.[5] This claim is unpreserved and therefore she seeks review under the plain error exception to the preservation requirement. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. "Plain error is error that is both harmful and obvious." *State v. Emmett*, 839 P.2d 781, 785 (Utah 1992).

---

5. The "theft" case included the charges for theft of a firearm and unlawful acquisition of a financial card.

¶62    Under the doctrine of invited error, however, Utah courts "have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the [trial] court that he or she had no objection to the [proceedings]." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (alterations in original) (citation and internal quotation marks omitted). "The 'invited-error' doctrine prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Layman*, 953 P.2d 782, 785 (Utah Ct. App. 1998) (citation and additional internal quotation marks omitted).

¶63    Here, the State and trial counsel agreed to consolidate the robbery and theft cases. At a June 22, 2010 hearing, the trial court expressed its understanding that "the State and the defense have agreed" that the two cases would be "consolidated." Trial counsel replied, "That's correct, your Honor." Thus, trial counsel expressly agreed to the consolidation, and we conclude that even if the trial court erroneously consolidated the two cases, the error was invited.

¶64    Defendant also asserts, in a single sentence, that "should the Court find that Trial Counsel invited the error made by the trial court, such invitation is further demonstration of the ineffectiveness of his overall representation." While the argument lacks focus, to the extent Defendant means to raise an additional ineffective-assistance claim, her claim is inadequately briefed. *See State v. Perea*, 2013 UT 68, ¶ 120, 322 P.3d 624 ("[A]n issue is inadequately briefed when it merely contains bald citation[s] to authority [without] development of that authority and reasoned analysis based on that authority.") (second and third alterations in original) (citation and internal quotation marks omitted); Utah R. App. P. 24(a)(9). Defendant has not cited any authority for this argument, let alone provided any analysis. Accordingly, we decline to further address Defendant's assertion that trial counsel was ineffective for agreeing to consolidate the robbery and theft cases.

¶65 Defendant asserts an additional ineffective-assistance claim related to her joinder argument. She contends that "[t]rial counsel was ineffective when he failed to object to inadmissible character evidence" under rule 404(b) of the Utah Rules of Evidence. Specifically, she argues that trial counsel should have objected to testimony regarding other alleged illegal acts she committed at Brian Head Ski Resort and that the testimony prejudiced her "by allowing the jury to convict her by inference—once a thief always a thief." To establish her claim of ineffective assistance of counsel, Defendant "must show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶66 "While Utah Rule of Evidence 404(b) excludes evidence of prior bad acts to show that a defendant acted in conformity with those acts, it does allow admission of prior crimes, wrongs, or acts to prove, among other things, intent." *State v. Johnson*, 784 P.2d 1135, 1141 (Utah 1989). *See also* Utah R. Evid. 404(b). But if prior bad acts were committed at "the beginning of a string of events all closely related in time that ended with" the charges at issue, evidence of those prior bad acts is admissible as "part of a single criminal episode." *See Johnson*, 784 P.2d at 1141. Moreover, "if the evidence has relevancy to explain the circumstances surrounding the instant crime, it is admissible for that purpose; and the fact that it may tend to connect the defendant with another crime[, wrong, or act] will not render it incompetent." *Id.* (alteration in original) (citation and internal quotation marks omitted). Here, the other alleged thefts occurred during the same crime spree that resulted in the two theft charges at issue in this case, i.e., the other alleged thefts occurred on the same nights during which Defendant stole the handgun, credit card, and gas card from cars at Brian Head Ski Resort.

¶67 Because the alleged instances of theft were committed at "the beginning of a string of events all closely related in time" to Defendant's charges for theft of a firearm and unlawful

acquisition of a financial card, *see id.*, we conclude that any objection based on rule 404(b) would have been futile, *see Codianna v. Morris*, 660 P.2d 1101, 1109 (Utah 1983) ("The failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance.") (citation and internal quotation marks omitted). In this case, the testimony pertaining to the alleged instances of theft was relevant to show Defendant's intent and "to explain the circumstances surrounding the instant crime," *see Johnson*, 784 P.2d at 1141 (citation and internal quotation marks omitted), i.e., Defendant's theft of the handgun, gas card, and credit card. Accordingly, trial counsel did not perform deficiently when he did not object.

¶68    Defendant also claims that trial counsel was ineffective for not objecting to the testimony of a man whose checkbook was stolen from his car at Brian Head Ski Resort between December 22 and 27 of 2010. But trial counsel *did* object to the man's testimony, and the trial court overruled his objection, agreeing with the State that (1) the man's testimony was relevant because "the time frame and . . . where it was located" made it more likely that Defendant was "the one that was in Brian Head taking the property" and (2) its prejudicial impact did not outweigh its probative value. On appeal, Defendant has not directly challenged this ruling. Accordingly, we decline to address this argument any further and conclude that Defendant has not demonstrated that trial counsel was ineffective in this regard.

IV. The Trial Court Did Not Err When It Denied Defendant's
Motion for New Trial Based on Newly Discovered Evidence.

¶69    Defendant argues that the trial court "abused its discretion by failing to order a new trial based upon newly discovered evidence." In her motion for new trial, Defendant claimed that her former cellmate would testify that Davis told her that she had fabricated her claims against Defendant.

Defendant supported her claim with a handwritten letter, allegedly written by the cellmate.

¶70 At an evidentiary hearing, the cellmate testified that she had written the letter. However, when the prosecutor produced two additional sets of handwritten notes during cross-examination—one in the cellmate's handwriting and one in Defendant's handwriting—the cellmate claimed that she dictated the note that was in Defendant's handwriting to Defendant and that Defendant dictated the note that was in the cellmate's handwriting. The cellmate then expressed confusion, stating that she did not "really recall" anything. But then she backtracked and agreed with the prosecutor that Defendant wrote an account of Davis's alleged recantation, which she then copied when writing her letter. On re-direct, she shifted course again and stated that Davis had recanted. She then expressed more confusion, stating, "I don't really recall any of this. . . . Yeah, I don't know who these people are. I don't know who this is."

¶71 The State then called a detective, who testified that he had met with the cellmate twice to discuss the letters. He testified that in the first meeting, the cellmate denied the existence of any letter but that in the second meeting she told him that Defendant had dictated what she should write. The cellmate told the detective that she cooperated because she was afraid Defendant's family would hire someone to hurt her family since they "had money" and because Defendant had contacts within the jail.

¶72 "We afford trial judges a wide range of discretion in determining whether newly discovered evidence warrants the grant of a new trial." *State v. Pinder*, 2005 UT 15, ¶ 66, 114 P.3d 551 (citation and internal quotation marks omitted). This is partly due to "the superior position the trial judge holds when assessing the credibility of the new evidence, an essential component of the determination of whether the evidence would

make a different result on retrial probable." *Id.* Therefore, "it is proper for the trial court, when confronted with a motion for a new trial due to newly discovered evidence, to consider the credibility of new witnesses as well as the manner in which new evidence meshes or clashes with evidence presented at trial." *Id.* ¶ 67.

> Evidence must meet three criteria in order to constitute grounds for a new trial: (1) [i]t must be such as could not with reasonable diligence have been discovered and produced at the trial; (2) it must not be merely cumulative; [and] (3) it must be such as to render a different result probable on the retrial of the case.

*State v. Montoya*, 2004 UT 5, ¶ 11, 84 P.3d 1183 (alterations in original) (citation and internal quotation marks omitted).

¶73 The trial court concluded that the cellmate's account of Davis's "alleged perjury is mere impeachment evidence that would not likely have affected the result at trial, given the number of witnesses supporting Ms. Davis's account." We readily agree.

¶74 The cellmate's testimony was seriously flawed, and her varying accounts regarding the source of the letter's content was reason enough for the trial court to question her credibility as a witness. *See Pinder*, 2005 UT 15, ¶ 67. Moreover, "[a]s a general rule, newly discovered evidence does not warrant a new trial where its only use is impeachment." *State v. Boyd*, 2001 UT 30, ¶ 28, 25 P.3d 985. Here, the cellmate did not have any personal knowledge of the case. Thus, "[a]t best, the new revelations could serve only to impeach" Davis's testimony. *See id.* And even if we were to disregard this rule, Defendant cannot demonstrate that a different result is likely upon retrial, *see Montoya*, 2004 UT 5, ¶ 11, because there was ample evidence beyond Davis's testimony that supported Defendant's convictions, *see State v. Wengreen*, 2007 UT App 264, ¶ 27, 167

P.3d 516. For example, the jury heard the Victim's first-hand testimony about Defendant's role in her assault and robbery, Blackner's corroborating testimony, testimony from the officers who found Defendant hiding in the garage, and the officers' accounts of Defendant's shifting stories. Therefore, even assuming Defendant could satisfy the first two prongs of the newly-discovered-evidence test, the trial court did not abuse its discretion in concluding that the evidence regarding Davis's recantation after trial, especially when offered by a witness who did not "really recall any of this" and who did not "know who these people are," would be unlikely to lead to a different result on retrial. *See Montoya*, 2004 UT 5, ¶ 11. We affirm the trial court's decision to deny Defendant's motion for new trial based on newly discovered evidence.

V. The Trial Court Did Not Err When It Denied Defendant's Motion for New Trial Based on Alleged Cumulative Error.

¶75 Finally, although the argument is somewhat unclear, Defendant appears to assert that the doctrine of cumulative error applies. Defendant contends that the trial court improperly denied her motion for new trial, claiming: "While [Defendant] argues that several of the individual errors are, by themselves, sufficient to merit reversal, . . . one wonders what it would take for the trial court to find for a defendant in this situation." "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). "In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred." *Id.* Although we did not determine that there were any errors in this case, aside from the invited one, we did assume error in multiple instances. Nevertheless, we conclude that the cumulative effect of the assumed errors does not undermine our confidence in the essential fairness of Defendant's trial. *See id.* Therefore, the trial

court did not err in denying Defendant's motion for new trial on this basis.

## CONCLUSION

¶76    We conclude that the trial court did not plainly err in failing to order a defense witness to testify at trial. Nor was trial counsel ineffective for failing to ask the trial court to compel the witness's testimony.

¶77    We affirm the trial court's denial of Defendant's motion for new trial on the grounds of ineffective assistance of counsel. Trial counsel's alleged sexual relationship with Defendant, while inappropriate under the Utah Rules of Professional Conduct, did not result in an actual conflict of interest as a matter of law. Additionally, under *Strickland*, Defendant failed to establish deficient performance, prejudice, or both for her remaining ineffective-assistance claims.

¶78    The trial court did not err when it consolidated Defendant's robbery and theft cases because any error was invited by trial counsel. And Defendant's ineffective-assistance claim pertaining to the consolidation is inadequately briefed.

¶79    We affirm the trial court's denial of Defendant's motion for new trial based on newly discovered evidence. The evidence did not render a different result probable on retrial.

¶80    Finally, the trial court did not err when it denied Defendant's motion for new trial on the ground of cumulative error. The cumulative effect of the assumed errors does not undermine our confidence in the fairness of Defendant's trial.

¶81    Affirmed.

_____